```
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

UNITED STATES OF AMERICA,    )    Case No. 3:22-mj-00884-BK-1
                             )
          Plaintiff,         )
                             )    Dallas, Texas
v.                           )    September 19, 2022
                             )    10:00 a.m.
RAYNALDO RIVERA ORTIZ, JR., )
                             )    PRELIMINARY HEARING
          Defendant.         )    DETENTION HEARING
_____)
```

                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE DAVID L. HORAN,
                     UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Plaintiff:          John J. de la Garza
                            Errin Martin
                            UNITED STATES ATTORNEY'S OFFICE
                            1100 Commerce Street, Suite 300
                            Dallas, TX  75242-1699
                            (214) 659-8600

For the Defendant:          Laura Harper
                            FEDERAL PUBLIC DEFENDER'S OFFICE
                            525 Griffin Street, Suite 629
                            Dallas, TX  75202
                            (214O) 767-2746

Recorded by:                Shakira K. Todd
                            UNITED STATES DISTRICT COURT
                            1100 Commerce Street, Room 1452
                            Dallas, TX  75242-1003
                            (214) 753-2165

Transcribed by:             Kathy Rehling
                            311 Paradise Cove
                            Shady Shores, TX  76208
                            (972) 786-3063


           Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

1          DALLAS, TEXAS - SEPTEMBER 19, 2022 - 10:21 A.M.

2          THE COURT:  The Court will call Case No. 3:22-mj-

3     884-BK, United States of America versus Raynaldo Rivera

4     Ortiz, Jr.  And I will take appearances.

5          MR. DE LA GARZA:  John de la Garza here for the

6     Government.  We're ready.

7          THE COURT:  All right.  Good morning.

8          MS. HARPER:  Good morning, Your Honor.  Laura Harper

9     here for Dr. Ortiz.  We are ready.

10       I have one small issue because of the crowded courtroom.

11    I have two witnesses that I'd like to have in the courtroom,

12    but I don't have a seat for them.

13         THE COURT:  Oh, I see.

14       (Pause.)

15         THE COURT:  Okay.  We're going to take a short

16    recess, Ms. Harper, to try and accommodate that.

17         MS. HARPER:  Thank you so much, Your Honor.

18         THE COURT:  All right.

19         THE CLERK:  All rise.

20       (A recess ensued from 10:22 a.m. until 10:31 a.m.)

21         THE CLERK:  All rise.

22         THE COURT:  All right.  Well, if both sides are

23    ready to proceed, I guess I hadn't said for the record but it

24    seems everyone knows, we're back for a preliminary and

25    detention hearing today.  So, Mr. de la Garza, if the

1    Government is ready.

2              MR. DE LA GARZA:  Yes, Your Honor.  The Government

3    is ready.

4              THE COURT:  All right.  Go ahead.

5              MR. DE LA GARZA:  The Government calls Special Agent

6    Dan Allgeyer.

7              THE COURT:  All right.

8              MR. DE LA GARZA:  It's spelled A-L-L-G-E-Y-E-R.

9              THE COURT:  Special Agent, if you could step over

10   here and then raise your hand to be sworn.

11       (The witness is sworn.)

12             THE COURT:  Thank you.  Have a seat.

13             MR. DE LA GARZA:  Your Honor, for record purposes,

14   I've given the witness a folder with proposed Government's

15   exhibits enclosed in them so he can look at those very

16   quickly.

17             THE COURT:  Okay.  Very good.  And Ms. Harper,

18   you've received a copy of that as well?

19             MS. HARPER:  Yes, Your Honor.

20             THE COURT:  All right.  Very good.

21       (Microphone adjusted.)

22             MR. DE LA GARZA:  Is that better?  Okay.

23       May I begin, Your Honor?

24             THE COURT:  Yes.  Thank you.

25             MR. DE LA GARZA:  And I can remain seated at counsel

Allgeyer - Direct                    4

1  table?

2            THE COURT:  Yes.  Please.

3            MR. DE LA GARZA:  Thank you.

4        DANIEL J. ALLGEYER, GOVERNMENT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6  BY MR. DE LA GARZA:

7  Q    What's your name, sir?

8  A    Daniel J. Allgeyer.

9  Q    How are you employed?

10 A    I'm a special agent with the Food and Drug

11 Administration, Office of Criminal Investigations.

12 Q    How long have you been with FDA?

13 A    I've been with FDA for six years now.

14 Q    Did you attend the Federal Law Enforcement Training

15 Center?

16 A    Yes, I did.

17 Q    Did you receive special training to be a federal agent?

18 A    Yes, I did.

19 Q    Before you were a federal agent, what kind of employment

20 did you have?

21 A    Prior to the FDA, I was with the United States Secret

22 Service for approximately seven years.  Prior to that, I was

23 a police officer in the city of Lenexa, Kansas.

24 Q    Are you involved with the criminal investigation of Dr.

25 Raynaldo Rivera Ortiz?

1    A    I am.

2    Q    Is the FDA working that investigation alongside the

3    Dallas Police Department?

4    A    We are.

5    Q    How did FDA become involved in investigating Dr. Ortiz?

6    A    The FDA was notified of a potential tampering on August

7    25th at the North Dallas Surgicare.

8    A    And when you say tampering, what kind of regulatory

9    oversight, what kind of criminal investigation ability does

10   FDA have regarding tampering?

11   A    Well, the FDA investigates crimes from the Federal Food,

12   Drug, and Cosmetic Act.  So, in this case, it was tampered IV

13   bags, which are considered, excuse me, considered both a

14   consumer product and a drug.

15   Q    Are IV bags, are they readily available to medical

16   professionals, people in the medical field?

17   A    Yes.

18   Q    Can you -- can you walk to -- down the street in Las

19   Vegas and actually walk into a place and get an IV bag

20   treatment?

21   A    You can, yes.

22   Q    The medical bags we're going to talk about today, did

23   those travel in interstate commerce?

24   A    They did.

25   Q    And the medical bags we're talking about, we're going to

1    talk about today, where did they come from?

2    A    They came from a company based in Chicago, but the bags

3    actually came from North Carolina.

4    Q    So the IV fluid bags we're going to talk about today

5    traveled in interstate commerce?

6    A    They did.

7    Q    Did the FDA look into the August 25th incident, and what

8    did you determine?

9    A    We looked into a number of incidents.  We were contacted

10   on August 25th.

11   Q    Yes, sir.

12   A    Reference to an incident on the 24th of August.

13   Q    And the incident on the 24th of August, what occurred,

14   according to the investigation?

15   A    According to the investigation, a Dr. Marsden was going

16   back to work, he actually works at the surgery center,

17   Surgicare, as an anesthesiologist.  He had headed back to

18   work to take a look at a number of patient records because

19   several critical incidents had happened over the course of

20   the previous four months at the Surgicare Center which caused

21   alarm.

22        When he responded to the Surgicare, there was an

23   ambulance outside, which was a very similar-type incident.

24   It's called a transfer.  Basically, if an emergency event

25   occurs at the Surgicare, a transfer from a medical --

1    emergency medical personnel to an emergency medical facility

2    must take place.

3          So he was there, he arrived at the Surgicare Center, saw

4    an ambulance, and immediately rushed into a patient's OR,

5    J.A., where he said to the administrator, we need to change

6    these IV bags.  He at the time had suspected that the IV bags

7    were the cause, as many of these -- of all these critical

8    events.  He told the administrator, take this IV bag.  He

9    told another nurse, get me an IV bag from outside of the

10   operating room area, get it from a new box, and bring me

11   another new IV bag in its outer bag.

12   Q    Okay.  And in terms of the -- when you said J.A., we're

13   referring to all the patients at the hospital today by their

14   initials; is that correct?

15   A    That is correct.

16   Q    And when you said Surgicare Center, what specific medical

17   facility are you referring to?

18   A    The Surgicare of North Dallas located on Coit Road.

19   Q    Is that a Baylor Scott & White facility?

20   A    It is a Baylor Scott & White facility.

21   Q    Is that facility located in the Northern District of

22   Texas?

23   A    It is.

24   Q    And were any IV fluid bags collected that day following

25   the J.A. incident?

1    A    Yes.  A number of IV bags were collected.

2    Q    And were any of those bags found to contain any

3    substances that they were not labeled to contain?

4    A    Correct.

5    Q    And specifically can you describe that?

6    A    Yes.  Two bags were recovered from the actual surgery,

7    one bag from J.A. -- that was hooked up to J.A. at the time

8    that Dr. Marsden entered the facility, and another that was

9    in the trash of the operating room area.  Those bags were

10   taken to the University of North Texas for toxicology and

11   then lab reports.

12       At that time, the surgery center was shut down.  They did

13   a -- employees did a search of the warmer, which is a device

14   that keeps these bags warm, located a number of bags, in

15   fact, two bags that appeared to have been tampered with

16   inside the warmer.

17   Q    And the bags from the warmer, how -- what way were these

18   bags tempered with?

19   A    Well, the bag, the IV bag itself is contained in an outer

20   bag, an outer clear plastic bag.  There were, under visual

21   observation, the doctors and employees found a potential -- a

22   marking indicating that a needle had been used to penetrate

23   the outer bag.

24   Q    And the outer bag, is that the one that has the labeling

25   on it, the company name, what it's supposed to contain, how

1    many milliliters it is?

2    A    Yes.

3    Q    And the inside bag, can you describe what the inside bag

4    looks like?

5    A    The inside of the IV bag should have some of the same

6    information, but it contains the medicine necessary, the drug

7    necessary for the operation.

8    Q    Is it a different type of material than the outer bag in

9    terms of composition?

10   A    Yes.  I do believe the outer bag is much less strong of

11   plastic, easily -- not easily, but able to be ripped open at

12   a certain point.  The IV bag itself is a heavier plastic.

13   Q    Do any of the IV bags from that day collected from the

14   surgical center, did any of them -- were they chemically

15   analyzed to determine -- for the -- if there was any

16   bupivacaine, lidocaine, or epinephrine inside them?

17   A    Yes.

18   Q    And how did that analysis come out?

19   A    So, the bag that was attached to J.A. actually tested

20   positive for the presence of bupivacaine, lidocaine, and

21   epinephrine.  The two bags found in the warmer outside those

22   ORs and in the OR hall tested positive for the presence of

23   bupivacaine and lidocaine.

24   Q    And what is bupivacaine?

25   A    Bupivacaine is a nerve-blocking agent.

1  Q    And that's spelled B-U-P-I-V-A-C-A-I-N-E?

2  A    That is correct.

3  Q    And what's lidocaine?

4  A    Lidocaine is also a type of nerve-blocking agent,

5  generally used topically, but it is also, like I said, a

6  nerve-blocking agent.

7  Q    Okay.  And what is epinephrine?

8  A    Epinephrine is a heart maintenance type medication that's

9  also known as adrenaline, so it is used in surgeries,

10 especially in specific critical events, to assist in the way

11 the heart works.

12 Q    According to the labeling on those IV fluid bags that

13 were collected on that day at the Surgicare Center, should

14 those bags have contained -- were they labeled to contain and

15 should they have contained any three of those drugs?

16 A    They were not supposed to contain those drugs.

17 Q    And can you explain, you mentioned a device called a

18 warmer at the Surgicare Center.  Can you describe what the

19 warmer is?

20 A    So, the warmer appears to be some type of refrigerator.

21 It's a stainless steel device with two doors that actually

22 works opposite of a refrigerator.  It can hold items at a

23 specific warmer temperature.

24 Q    Are there IV bags that are stored in other places in the

25 surgery center besides the warmer?

1  A    Yes.  At this particular surgery center, there were bags

2  of IV fluid that were stored in what's called pre-op, or pre-

3  operation.  They are not generally stored in a warming

4  device.

5  Q    And why are they generally not stored in the warming

6  device?

7  A    The understanding that I have is that pre-operation,

8  generally, the patient is already under anesthesia when the

9  IV bag fluids are administered.  Those are generally not body

10 temperature, which is why you would want a warmer.  When in

11 the OR, people can be -- patients can be in any number of

12 degrees of waking up, or they might be aware of some type of

13 thing, aware of their surgery.  So it would be patient

14 comfort.  That's the main reason for the warmer.

15 Q    Are the IV bags, IV fluid bags, before they're brought to

16 the OR or put in the warmer, are they stored somewhere at the

17 Surgicare facility?

18 A    They are.

19 Q    And they come arrive -- they arrive shipped in cardboard

20 boxes, correct?

21 A    Yes.

22 Q    And who normally stocks those bags in the warmer at the

23 Surgicare Center?

24 A    The anesthesia tech.

25 Q    Is it, according to your discussions with the surgery

1    care folks there -- the staff, the doctors, the nurses -- is

2    it common or uncommon for a doctor to put IV bags in the

3    warmer?

4    A    To put it in the warmer?  Very uncommon.

5    Q    Were there any instances of people who related that they

6    had seen doctors do that?

7    A    In fact, yes, there were.

8    Q    And we're talking, so the record is clear, we're talking

9    for the time period May through August of 2022.  Is that what

10   you're testifying to?

11   A    Yes, sir.

12   Q    Was there an instance of seeing someone put an IV bag in

13   the warmer during that time period?

14   A    Yes.

15   Q    Who was that that put it in the warmer?

16   A    Dr. Ortiz.

17   Q    In terms of epinephrine, bupivacaine, and lidocaine, are

18   those drugs kept at the surgery center?

19   A    Yes, they are.

20   Q    Where are they kept in reference to the warmer?

21   A    The warmer -- if you're facing the warmer, there is a

22   cabinet to the right.  On the top right shelf is where these

23   were located.  These three are all located in that shelf --

24   in that cabinet.

25   Q    Did -- according to medical staff there at the surgery

1    center, did Dr. Ortiz have access to that cabinet?

2    A    Yes.

3    Q    Is that cabinet locked during the day?

4    A    No, it is not.

5    Q    Is it ever locked?

6    A    It is.  Overnight.

7    Q    Going back from August of 2022, was there an incident

8    that was related or reported to you concerning a doctor at

9    the facility, who worked at the facility, and an IV bag,

10   fluid bag?

11   A    Yes, there was.

12   Q    And what was that incident?

13   A    On June 21st, a Dr. M.K., who was also at the surgery

14   center, was reported to have taken a bag of IV fluids back to

15   her house.  She was feeling under the weather, and she took

16   the bag of IV fluids to treat her dehydration back to her

17   house.

18        She actually -- she inserted the IV bag, and within about

19   15 minutes started experiencing a critical cardiac event.

20   She told her husband at that time, call 911.  And before

21   medics arrived, she was pronounced dead at the scene.

22   Q    What was the cause of her death that was diagnosed by the

23   medical examiner?

24   A    Toxicity of bupivacaine.

25   Q    And she worked or practiced medicine at the surgery

Allgeyer - Direct                          14

1    center?

2    A    Yes.

3    Q    Did the surgery center staff identify any other incidents

4    in which patients experienced cardiovascular complications

5    during surgeries that summer?

6    A    Yes.  Over the course of the previous four months, there

7    were at least ten incidents of the -- of similar critical

8    cardiac events.

9    Q    And I'll ask you to look in your folder there.  If you

10   can pull out what's been marked Government's Exhibit 5.

11   A    Okay.

12   Q    Do you recognize what Government's Exhibit 5 is?

13   A    Yes, sir, I do.

14   Q    What is it?

15   A    This is a timeline of suspected cardiac events and other

16   suspicious occurrences at the facility.

17   Q    Does it also have some other incidents which are relevant

18   to the hearing today?

19   A    Yes, sir.

20   Q    Okay.  Would this assist you in your testimony to the

21   Court today?

22   A    Yes, it would.

23   Q    Do you believe it would also assist the Court in

24   understanding the facts and circumstances of the case?

25   A    Yes, I do.

1          MR. DE LA GARZA:  Your Honor, at this time I'd offer

2    an exhibit -- into evidence Government's Exhibit 5.

3          MS. HARPER:  No objection, Your Honor.

4          THE COURT:  Government Exhibit 5 is admitted.

5       (Government's Exhibit 5 is received into evidence.)

6          MR. DE LA GARZA:  May I approach, Your Honor?

7          THE COURT:  Yes, thank you.  Thank you.

8    BY MR. DE LA GARZA:

9    Q    Now, looking at Government's Exhibit 5, the incidents you

10   described, the ten or eleven incidents, are they marked in

11   red and orange?

12   A    Yes, they are.

13   Q    And was there any commonality to these incidents in terms

14   of medical emergency?

15   A    Yes.

16   Q    What were those?

17   A    Each one of these patients, the cardiac events were very

18   similar, in which -- during which the -- the heart would

19   race, the heart -- the blood pressure would rise to a level

20   that was not conducive to the operation that was being

21   performed.  Therefore, they had to stop the operation.  A

22   crash cart was used in each one of the incidents, except for

23   M.K., a crash cart was used to lower that person's blood

24   pressure and heart rate.  Stabilize, in other words.  And

25   each one of these patients was then again transferred to an

1  emergency medical facility by EMTs or ambulance.

2  Q    Now, you used the word, the term crash cart.  What do you

3  mean by crash cart?

4  A    A crash cart is something used in something -- in an

5  event that is extreme.  In other words, emergency medicine.

6  It contains emergency medicine of a number of different

7  types, from lower blood pressure, high blood pressure, heart

8  indications, all types of emergency medicine.  However, this

9  facility is not built to handle emergencies.

10 Q    And in terms of vital signs that these patients

11 experienced during or while they were coming out of surgery,

12 what was one of the highest blood pressures that staff at the

13 surgery center related to you that they measured or saw?

14 A    There was a blood pressure related to us of 200/150.

15 Q    Was that something that should -- that the surgery staff

16 there expected during a surgery or after a surgery?

17 A    Absolutely not.

18 Q    And in terms of these transfers for emergency treatment

19 that resulted in these incidents, were there -- did the --

20 was that a common thing, a common occurrence at the surgery

21 center?

22 A    Not in -- not in its history.

23 Q    How many transfers did the surgery center have in 2021

24 like this?

25 A    In the year of 2021, they had five total transfers.

Allgeyer - Direct                              17

1   Q    How many did they have in August of 2022?

2   A    Just in the month of August, they had five transfers.

3   Q    Did any of these cardiovascular emergency incidents occur

4   during a surgery in which Dr. Ortiz was the anesthesiologist?

5   A    Not one.

6   Q    Was Dr. Ortiz the anesthesiologist for numerous surgeries

7   from May of 2022 through August of 2022 at that surgery

8   center?

9   A    Yes, he was.

10  Q    Going back to May of 2022, did Dr. Ortiz at some time in

11  May of 2022 become aware of a disciplinary action against him

12  by the hospital?

13  A    He did.

14  Q    And what was the disciplinary action concerning?

15  A    On May 19th of 2022, there was an incident with Patient

16  G.A. during which Dr. Ortiz was that patient's

17  anesthesiologist.  During the surgery, the patient went into

18  respiratory distress.  Actually, an obstructed airway was

19  found.  And it took quite a while to get that patient stable

20  again.

21  Q    And is there something called a MEC or M-E-C at the

22  surgery center that meets to discuss incidents like this?

23  A    Yes, it is.

24  Q    Did the MEC review that incident?

25  A    They did.

1    Q    Was Dr. Ortiz aware of that review and that disciplinary

2    -- potential of disciplinary action against him?

3    A    Yes, he was.

4    Q    And that was roughly May 24th of 2022?

5    A    Yes, sir.  Five days later.

6    Q    And approximately how many days later was -- was a

7    cardiovascular incident?  When did that occur?

8    A    On --

9    Q    Approximately how many days later?

10   A    On May 24th, the disciplinary inquiry happened.  Two days

11   later, on the 26th of May, was the first critical cardiac

12   event.

13   Q    Did Dr. Ortiz relate his feelings to any of the staff

14   there at the surgery center concerning disciplinary action?

15   A    Yes.

16   Q    And what did he say?

17   A    He said he feels like he was being crucified for the

18   event.

19   Q    Did any of the Surgicare staff there relate to

20   investigators what they thought the consequences of Dr. Ortiz

21   -- what the consequences would be for Dr. Ortiz if he lost

22   his privileges there at the surgical center?

23   A    Yes.  He said it would be devastating financially.

24   Q    Was there an incident in August of 2022 involving Dr.

25   Ortiz waving off an IV bag during a surgery he was performing

1   anesthesiology for?

2   A    There was.

3   Q    Can you describe to the Court about that incident?

4   A    Yes.  A nurse reported to us that she had actually

5   retrieved an IV bag for one of Dr. Ortiz's surgeries.  In the

6   -- in the presence of, I'm sorry, in the manner between the

7   warmer and the OR, the OR where Dr. Ortiz was located, she

8   had ripped open the outer bag, exposing the inside bag.  When

9   she presented it to Dr. Ortiz, he vehemently refused the bag

10  and said he would get his own bag.

11       The nurse actually stated that she was alarmed by this,

12  and immediately threw that bag away, as per protocol.  Since

13  it had gone into a sterile area, it does not go back into the

14  warmer, she said.

15  Q    So it's not a common practice, or even accepted practice,

16  at the surgery center for medical staff to take an IV bag

17  into an OR, maybe leave it unused, and then bring it back and

18  put it in the warmer?

19  A    It is not common practice.

20  Q    Is it a hygienic practice, according to medical staff

21  there?

22  A    Absolutely not.

23  Q    Did medical staff also relate to you around this time

24  frame of May of 2022 to August of 2022, that Dr. Ortiz

25  retrieved his own I bags from the -- IV bags from the warmer?

1    A    Yes.

2    Q    Is that a common practice for the physicians there?

3    A    They said it was not.

4    Q    Kind of switching gears here, to your knowledge does Dr.

5    Ortiz owe the IRS a substantial sum of money?

6    A    To my knowledge, he owes several million dollars.

7    Q    And when was the first tax lien placed against him in

8    public records, to your knowledge?

9    A    2015.

10   Q    And what's the most recent tax lien that's been placed

11   against him?

12   A    This year, 2022.

13   Q    To your knowledge, how many cars does Dr. Ortiz own?

14   A    I believe it's five cars.

15   Q    Do you know the makes and models or the -- are these --

16   are these luxury cars?  Are these something like a prosecutor

17   would drive?

18   A    This is a luxury car, a number of luxury cars and a

19   sports car.  One Corvette, three Mercedes, and one Lexus.

20   Q    Did Dr. Ortiz take a vacation from the surgery -- from

21   practicing there at the surgery center in July of 2022?

22   A    Yes, he did.

23   Q    And what were the dates of that vacation?

24   A    The 23rd through the 28th of July.

25   Q    Were there any cardiovascular emergency type incidents

Allgeyer - Direct                           21

1    like the ones you described during the time he was on

2    vacation?

3    A    Not while he was on vacation.

4    Q    Did the incidents start back up after he came back to

5    work?

6    A    Yes.

7    Q    What was the next day after his vacation that he came

8    back to work?

9    A    August 1st.

10   Q    And was there an incident on that day?

11   A    Yes, there was.

12   Q    Does Baylor Surgery Center, was that -- August 1st, was

13   that -- what day of the week was that?

14   A    It was a Monday, I believe.

15   Q    Does the surgery center in question we're talking about,

16   do they perform surgeries on the weekends?

17   A    No, they do not.

18   Q    Does the surgery center have surveillance cameras inside

19   the facility?

20   A    Yes, they do.

21   Q    Does one of those cameras film the hall on which the IV

22   bag warmer is located?

23   A    Yes.

24   Q    Is that hall called the OR hall?

25   A    Yes.

1  Q    Have you and other investigators reviewed the

2  surveillance footage from those cameras beginning on or about

3  August 1st or 2nd?

4  A    Yes.  I believe August 2nd is the first date which we

5  could review footage.

6  Q    The surveillance camera that films the hall, on August

7  4th, is Dr. Ortiz seen on the OR hall around 11:35 a.m.?

8  A    Yes, he is.

9  Q    And what does he do?

10 A    At around 11:35 in the a.m., Dr. Ortiz is seen leaving

11 the area of OR-5 with a bag, an IV bag in his hands.  He

12 enters the hallway, where no one else is, looks around, and

13 actually places the IV bag in the warmer.

14 Q    Is -- if you can look in your folder there, there should

15 be a card there, a memory card.  Some people call it a memory

16 stick.

17 A    Yep.

18         MR. DE LA GARZA:  I'm sorry.  May I approach, Your

19 Honor?

20         THE COURT:  You may.

21 BY MR. DE LA GARZA:

22 Q    I'm handing you -- I'm sorry.  I'm asking you -- I will

23 ask you to identify what I've just given you.  What is that?

24 A    This is a memory stick.

25 Q    Have you reviewed what's on that memory stick earlier

1    today?

2    A    I have.

3    Q    And what's on that memory stick?

4    A    There are two surveillance videos, one from August 4th

5    and one from August 19th.

6    Q    And the one from August 4th we were just talking about,

7    correct?

8    A    Yes, sir.

9    Q    Okay.  Is that -- Government's Exhibit 5, is that the

10   footage from August 4th?

11   A    Uh, --

12   Q    I'm sorry.  Government's Exhibit 6.  Is that the footage

13   from August 4th?

14   A    Yes.

15   Q    Okay.  Does it accurately, Government's Exhibit 6, does

16   it accurately depict what the surveillance footage showed

17   when you first viewed it?

18   A    Yes, it does.

19          MR. DE LA GARZA:  Your Honor, at this time, we'd

20   offer Government's Exhibit 6.

21          MS. HARPER:  Your Honor, my only objection is that

22   this agent is here and can testify as to what's in these

23   videos.  It's in the complaint.  And we don't have any

24   objection as to the veracity of his testimony.  So in an

25   abundance of care for the Court's time, we'd ask that the

1   agent just testify briefly as to what's there, rather than

2   the Court having to spend time watching it.

3              THE COURT:  Okay.  I appreciate that, but if the

4   Government, in trying to meet its burden, wants to show

5   video, I'm going to allow them to.

6              MS. HARPER:  Thank you, Your Honor.

7              THE COURT:  So Government's Exhibit 6 will be

8   admitted.

9         (Government Exhibit 6 is received into evidence.)

10             MR. DE LA GARZA:  Yes, Your Honor.  May we publish

11  the exhibit?

12             THE COURT:  You may.

13             MR. DE LA GARZA:  Thank you.  And so the Court is

14  aware, it's less than a minute.

15             THE COURT:  Okay.

16             MR. DE LA GARZA:  So, --

17        (Pause.)

18             MR. DE LA GARZA:  Yes, ma'am.  Can you hold on,

19  actually?  Hold for a second?

20        (Pause.)

21        (Recording played, 10:57 a.m.)

22  BY MR. DE LA GARZA:

23  Q    Following what we just saw on Government's Exhibit 6, was

24  there an emergency cardiovascular incident involving a

25  patient there at the surgery center?

1    A    Yes, there was.

2    Q    And approximately what time was that emergency incident?

3    A    So, on August 4th, Dr. Ortiz is seen leaving the OR-5

4    area at 11:35 in the morning.  At approximately 12:11 p.m., a

5    staff member retrieves a bag from the IV -- IV bag from the

6    warmer and takes it into their OR.  At approximately 12:50,

7    the cardiovascular event occurs.

8    Q    And that patient, were they transported from the surgery

9    center to an emergency facility?

10   A    After stabilization, they were transported.

11   Q    Was there a similar sequence of events involving Dr.

12   Ortiz placing a bag in the warmer on August the 9th?

13   A    Yes, there was.

14   Q    And can you describe for the Court that incident?

15   A    On August the 9th at approximately 10:19 in the morning,

16   Dr. Ortiz can be seen leaving the area of OR-5, again, with

17   an IV bag in his hands.  He goes to the warmer.  No one else

18   is in the area at the time.  He places the IV bag in the

19   warmer and leaves the area.

20   Q    Was there an incident later that day?

21   A    There was.

22   Q    And can you describe for the Court what happened in that

23   incident?

24   A    Again, he placed the bag around 10:19 in the morning.  At

25   approximately 10:54, a staff member retrieves an IV bag from

Allgeyer - Direct                              26

1    the warmer.  And at 11:02, a cardiac event occurs.

2    Q    Was there a similar incident involving Dr. Ortiz placing

3    a bag in the warmer on August the 19th?

4    A    Yes.

5    Q    And is there surveillance video footage of that incident?

6    A    There is.

7    Q    Is that what's on the memory card as Government's Exhibit

8    7 that you previously reviewed?

9    A    Yes, it is.

10          MR. DE LA GARZA:  Your Honor, at this time we'd

11   offer into evidence Government's Exhibit 7.

12          MS. HARPER:  No objection, Your Honor.

13          THE COURT:  All right.  Government Exhibit 7 will be

14   admitted.

15      (Government's Exhibit 7 is received into evidence.)

16          MR. DE LA GARZA:  May we publish, Your Honor?

17          THE COURT:  You may.

18          MR. DE LA GARZA:  Thank you.

19      (Pause.)

20   BY MR. DE LA GARZA:

21   Q    Agent, it may not have been apparent from a first view of

22   the video, but did Dr. Ortiz have an IV bag under his arm

23   when he approached the warmer?

24   A    Yes.

25   Q    And how was that IV bag concealed?

1  A    He concealed the IV bag with what appeared to be a folder

2  full of papers.

3  Q    And did he retrieve an IV bag from the warmer?

4  A    Yes.

5  Q    Was there a cardiovascular emergency incident involving a

6  patient at the surgery center later that day?

7  A    Yes.

8  Q    And what was that and how long after Dr. Ortiz placed

9  that IV bag in the warmer did it occur?

10  A    On the video, you see at approximately 10:34 in the

11  morning Dr. Ortiz places a bag.  At 10:42, a staff member

12  retrieves the bag, a bag, from the warmer.  And at

13  approximately 11:00 o'clock the cardiac event occurs.

14  Q    And was that patient transferred to an emergency facility

15  as a result of the event?

16  A    After stabilization, yes.

17  Q    Did Dr. Ortiz place an IV bag in the warmer on the day

18  after J.A.'s surgery?

19  A    I'm sorry.  The day before.  Yes.

20  Q    The day before.  I'm sorry.

21  A    Correct.

22  Q    And when was J.A.'s surgery again?

23  A    J.A.'s surgery was on the 24th of August.

24  Q    What does the surveillance footage show on the 23rd

25  involving Dr. Ortiz placing a bag in the warmer?

1   A    At approximately 8:30 in the morning, Dr. Ortiz is seen

2   leaving the area of OR-5, again, with a bag in his hand,

3   going to the warmer and placing the bag.

4   Q    Did something -- did someone restock the warmer after Dr.

5   Ortiz placed the bag in the warmer?

6   A    Yes.  A few hours later, the -- the anesthesiology tech

7   did do a restock of the warmer.

8   Q    And approximately how many bags does the warmer hold or

9   contain?

10  A    Anywhere from 30 to 40 bags.

11  Q    And shifting gears again here, during the investigation,

12  did the investigators interview any surgical care staff who

13  stated they were afraid of Dr. Ortiz?

14  A    Yes.  There were two staff members who indicated that

15  they were nervous to speak with us because they were afraid

16  of what Dr. Ortiz would do to them.

17  Q    Historically, has Dr. Ortiz exhibited any violent

18  behavior at any medical facilities at which he's practiced?

19  A    Yes.

20  Q    And what -- can you describe for the Court that incident?

21  A    During the COVID pandemic, it was relayed to us that Dr.

22  Ortiz, while working at the Dallas Regional Medical Center,

23  was approached by administration and told to put his mask on.

24  Dr. Ortiz became very angry with that administrative

25  personnel.  In fact, reports are that Dr. Ortiz started

1    yelling at them and got into their face so much that they --

2    that he actually touched their face, their mask with his

3    face.

4         Security was called.  When Security got to the area, Dr.

5    Ortiz had already entered a sterile OR room.  Security

6    knocked on the window, please come out, we need to speak with

7    you, at which time Dr. Ortiz looked at them, administered

8    anesthesia on the patient, meaning that he would have to stay

9    with the patient until stable.

10   Q    To your knowledge, has Dr. Ortiz been convicted of a

11   crime?

12   A    Yes.

13   Q    And which crime was that and when did that occur?

14   A    In 2016, Dr. Ortiz was convicted of cruelty to a non-

15   livestock animal.

16   Q    And what kind of animal was he cruel to?

17   A    A dog.

18   Q    And can you relate to the Court the underlying facts of

19   that incident, to your knowledge?

20   A    It was actually his neighbor's dog.  He was convicted of

21   shooting the neighbor's dog in 2016.  The neighbor actually

22   testified against him at a protection order hearing.  The

23   neighbor was in his house during a domestic violence event

24   and witnessed the event, testified against him at the

25   protection order hearing.  The protection order was granted,

1  after which Dr. Ortiz shot the neighbor's dog and was

2  convicted.

3  Q    I'm going to ask you to look in your folder there and

4  find Government's Exhibit 2, please.  Do you recognize

5  Government's Exhibit 2?

6  A    I do.

7  Q    What is it?

8  A    This is the opinion of the Court of Appeals Fifth

9  District of Texas in Dallas.

10 Q    Is that concerning the crime for which Dr. Ortiz was

11 convicted, the one you just described?

12 A    Yes.

13          MR. DE LA GARZA:  Your Honor, at this time we offer

14 into evidence Government's Exhibit 2, please.

15          MS. HARPER:  No objection, Your Honor.

16          THE COURT:  Government Exhibit 2 is admitted.

17      (Government's Exhibit 2 is received into evidence.)

18 BY MR. DE LA GARZA:

19 Q    And that memorandum opinion goes into some detail about

20 this incident, correct?

21 A    Yes, it does.

22 Q    Was Dr. Ortiz disciplined following that conviction for

23 failing to report his arrest on that conviction at the

24 hospitals at which he worked?

25 A    Yes, he was.

1   Q    And who was he disciplined by?

2   A    The Texas Medical Board.

3   Q    Did he receive a public reprimand?

4   A    He did.

5   Q    And I'll ask you to look at Government's Exhibit 1 and 3,

6   please, in your binder.  Look at both those and tell me what

7   Government's Exhibit 1 and 3 are, if you can.

8   A    Government's Exhibit 1 is the complaint issued by the

9   Texas Medical Board and Government's Exhibit 3 is the agreed

10  order on formal filing from the Texas Medical Board.

11          MR. DE LA GARZA:  Your Honor, at this time we'd

12  offer into evidence Government's Exhibit 1 and 3.

13          MS. HARPER:  Your Honor, with regard to the

14  complaint, we have an objection to that being used as

15  evidence here, the reason being that it is very much like a

16  complaint or an indictment in court here.  When the findings

17  -- and in this case, the Medical Board made a finding, which

18  is in Exhibit 3, we have no objection to the findings, but

19  there are allegations in the complaint which, based on the

20  agreed order in Exhibit 3, indicate -- that order indicates

21  that the other allegations in this complaint were likely

22  found not to be true.  And so we object to any discussion of

23  the allegations that were found not to be true by the Medical

24  Board.

25          THE COURT:  Mr. de la Garza?

1          MR. DE LA GARZA:  Your Honor, as the Court is aware,

2     in a probable cause hearing or detention hearing, the Court

3     can entertain allegations, not findings.  They're all

4     relevant to a person's character, to their previous history,

5     the way they've conducted themselves.  We think they're

6     relevant in the sense that it gives the Court a good view of

7     what he was -- what he was -- alleged against him versus what

8     was found.  It's a comprehensive kind of completeness to the

9     record of saying, here's what they alleged, here's what was

10    found.

11         THE COURT:  I'm going to overrule the objection and

12    admit it.

13       Ms. Harper, but I understand your point and I think

14    you'll -- I think it -- I believe it goes to the weight, not

15    the admissibility of the evidence, and I will take that -- in

16    reviewing anything in Exhibit 1, I will take into

17    consideration what you've pointed out.

18         MS. HARPER:  Thank you, Your Honor.

19         THE COURT:  All right.  So, Government's Exhibits 1

20    and 3 will be admitted.

21         MR. DE LA GARZA:  Thank you, Your Honor.

22       (Government's Exhibits 1 and 3 are received into

23    evidence.)

24    BY MR. DE LA GARZA:

25    Q    Was Dr. Ortiz again disciplined by the Texas Medical

1    Board in August of 2022?

2    A     Yes.

3    Q     And what happened in that disciplinary action?

4    A     That references an incident in November of 2020 during

5    which Dr. Ortiz's patient received -- or, Dr. Ortiz's patient

6    had a -- another airway blockage, another critical incident.

7    Q     And that was in November of 2020?

8    A     Correct.

9    Q     And can you look at Government's Exhibit 4, please, and

10   tell us what that is, if you can?

11   A     This is the agreed order in August of 2022.

12   Q     And if you go down about six lines from the title, does

13   it say -- reference a settlement conference in one of the

14   lines?

15   A     In the Agreed Order section?  I'm sorry.

16   Q     Yeah.  The second paragraph on the first page.

17   A     Got it.

18   Q     Does it say the word settlement conference there?

19   A     Yes.  Settlement conference.  I'm sorry.

20   Q     And on Page 11 of Government's Exhibit 4, does -- is this

21   a document signed by Dr. Ortiz?

22   A     Yes, it is.

23         MR. DE LA GARZA:  Your Honor, at this time we offer

24   into evidence Government's Exhibit 4, the agreed order dated

25   August 17th of 2022.  I'm sorry.  August 19, 2022.

1          MS. HARPER:  No objection, Your Honor.

2          THE COURT:  All right.  Government's Exhibit 4 is

3   admitted.

4      (Government's Exhibit 4 is received into evidence.)

5   BY MR. DE LA GARZA:

6   Q    Turning to other things that have been reported to

7   investigators concerning Dr. Ortiz by medical staff at

8   facilities at which he's worked, did the investigators talk

9   to a woman, a nurse, that believes Dr. Ortiz drugged her on a

10  date that he had with her in 2022?

11  A    Yes.

12  Q    Can you relate what she reported to the investigators?

13  A    The nurse reported that, after having worked with him

14  previously -- I believe they met in 2017 -- he attempted to

15  ask her on a date a number of times, for which she said no.

16  Over the course of several years, he asked a number of times,

17  and in 2022 she finally agreed to go on a date with him.

18  During the date, they went alone to a restaurant, had two

19  drinks.  She said that during the second drink she felt

20  woozy.  The next thing she remembers is waking up in the

21  emergency room.  She said she was told she was found in that

22  restaurant's bathroom.

23  Q    And then again changing gears to Dr. Ortiz's arrest, when

24  was Dr. Ortiz arrested?

25  A    Dr. Ortiz was arrested, I believe, September 14th.  It

1   was last Wednesday.

2   Q    And what kind of car was he driving when he was arrested?

3   A    He was driving a two-door Mercedes, white.

4   Q    Was that the car that surveillance had seen him driving

5   for the previous week or two weeks?

6   A    No.  It was not.

7   Q    And was there an issue with the plates on that car?

8   A    Yes.

9   Q    And what was that issue?

10  A    The plates were expired in 2020.

11  Q    And when he was arrested, did he have any money with him?

12  A    He did have some cash, yes.  He had $7,000 approximately

13  in cash, of which $3,000 was found in his pockets, and two

14  envelopes from JPMorgan Chase, each with $2,000, were found

15  in his bag.

16  Q    Did Dr. Ortiz have any drugs on him when he was arrested?

17  A    He did.

18  Q    What type of drug was that?

19  A    He had lidocaine on him.

20  Q    And what was the lidocaine contained in?

21  A    It appeared to be a tube for a topical use of lidocaine.

22  It was marked and identified as lidocaine.

23  Q    Was lidocaine one of the drugs that was -- you've talked

24  about before found in the IV bags at the surgery center?

25  A    Yes, it was.

1          MR. DE LA GARZA:  One moment, Your Honor.

2          THE COURT:  Okay.

3          MR. DE LA GARZA:  Thank you.

4      (Pause.)

5  BY MR. DE LA GARZA:

6  Q   Going to Government's Exhibit 5, Agent Allgeyer, are the

7  disciplinary incidents noted on Government's Exhibit 5?

8  A   They are.

9  Q   And what are the dates of the disciplinary inquiries?

10 A   May 24th of 2022 and June 22nd of 2022.

11 Q   Are the suspected cardiovascular incidents, the ten or so

12 at the surgery center, are they noted on the timeline?

13 A   Yes, they are.

14 Q   And are they in black text?

15 A   They're in black text, yes.

16 Q   And then the -- the incidents that we've talked about

17 today, involving M.K., J.E., T.Y., K.P., and J.A., noted on

18 the timeline?

19 A   Yes.

20 Q   And are those noted -- how are they noted?

21 A   They are in red.

22 Q   Big red dots?

23 A   Right.

24          MR. DE LA GARZA:  Pass the witness, Your Honor.

25          THE COURT:  Thank you.  Ms. Harper?

1          MS. HARPER:  Thank you, Your Honor.

2                        CROSS-EXAMINATION

3  BY MS. HARPER:

4  Q    Forgive me.  This was a lot.  Agent -- is it Allgeyer?

5  A    Yes, ma'am.

6  Q    Agent Allgeyer, you said you've been with the FDA for six

7  years, and before that with the Secret Service.  Have you had

8  any medical training?

9  A    No, ma'am.

10 Q    Have you ever done any work in a surgical center such as

11 this center?

12 A    No, ma'am.

13 Q    So your familiarity with this is based on what?

14 A    The relayings we have had from staff members, doctors,

15 anesthesiologists, from the Surgicare Center.

16 Q    Thank you.  With regard to the history of the surgical

17 center, you testified, I believe, that in 2021 the surgical

18 center had five similar incidents.

19 A    Yes.  That's what we were told.

20 Q    Have you seen the records -- I'm sorry.

21 A    I'm sorry.  Five incidents during which a patient needed

22 to be transported for emergency medical.

23 Q    Okay.  Do they also have incidents like this,

24 cardiovascular-type incidents, where they decide not to

25 transport a patient?

1   A    Sorry, I don't know the answer to that.

2   Q    Okay.  When they have in the past transported a patient

3   with an incident like this, has a review been done to find

4   out what happened?

5   A    I do believe they were looking into it as -- as the

6   occurrences kept coming.

7   Q    Okay.  So in the -- all the five incidents that you've

8   been told about in 2021, have you been told what caused each

9   of those five incidents?

10  A    No, ma'am.

11  Q    And do you know if anyone did blood tests on those

12  patients to find if there was evidence of any type of drug

13  that shouldn't have been there?

14  A    No, ma'am.

15  Q    Do you know if anybody preserved the IV bags from those

16  patients?

17  A    Back in 2021?  No, ma'am.

18  Q    Okay.  And with regard to all these incidents in 2022, do

19  you know if any tests had been done on any of the patients

20  prior to August of 2022?

21  A    No, I don't know that.

22  Q    Okay.  Do you know if -- what -- let me see.  For those

23  other incidents in 2022, was a review done on each particular

24  patient who was referred to the emergency room?

25  A    I imagine they did some type of review to try and figure

1    out what the causes were, but I am not privy to exactly what

2    review was conducted.

3    Q    Have you been offered access to all of those files?

4    A    At this point, I don't know if we've reviewed any files

5    just yet.  We are just mostly working with staff members and

6    what their comments are about what was -- what was different

7    about these, what was suspect, so to speak.

8    Q    Okay.  And prior to someone -- actually, I am kind of

9    curious.  You said Dr. Marsden, on August 24th, went back and

10   was -- and specifically looking at the IV bags.  Why was

11   there a concern by Dr. Marsden about the IV bags?

12   A    So, he got there on the 24th of August.  He had a

13   procedure on the 19th of August himself where one of these

14   cardiac events occurred.  And he had difficulty trying to

15   figure what it was.  He spent the weekend trying to figure

16   out and racking his brain.  He said the only thing he could

17   come up with is that the second IV bag that was there for his

18   patient, the incident occurred approximately 15 minutes after

19   that second IV bag went on.

20   Q    Uh-huh.

21   A    When that patient was finally stabilized, he took the IV

22   bag down and placed it on his or her chest during the

23   transport.  He was with that patient in the ambulance.  Her

24   blood pressure was high.  It was the reason for the cardiac

25   incident.

Allgeyer - Cross                                    40

1        By the time they had gotten to the emergency medical

2    facility, they redid her blood pressure and it was extremely

3    low.

4        So he come -- he thought the idea that this bag had

5    something to do with it, and the fact that gravity was no

6    longer causing the IV to flow because it was placed on her

7    chest, that was the incident that caused him to really think

8    over the weekend.

9        Again, he made it to the hospital on the 24th thinking

10   that this might be the way to do it, and he saw the

11   ambulance, and he went in and immediately said, IV bag, let's

12   try and see if this is the cause.

13   Q    Did he retain the IV bag from the patient that he

14   transferred to the hospital?

15   A    On the 19th?

16   Q    Yes, sir.

17   A    Not to my knowledge.  I don't think so.

18   Q    Okay.  With regard to the staff at the surgical facility,

19   how long has Dr. Ortiz worked there?

20   A    The Surgicare in North Dallas, I don't know.  I'm sorry.

21   There are so many things that are going around.

22   Q    If I propose that he might have been there since it first

23   opened, would you have any reason not to believe that to be

24   true?

25   A    I -- I truly don't know.  I'm sorry.

Allgeyer - Cross                    41

1   Q    Okay.  How much employee change has there been at that
2   facility?
3   A    That was not something else that we were aware of,
4   either.
5   Q    Do you know how many new physicians might have come in in
6   2022?
7   A    No, I don't know that.
8   Q    Do you know how many new techs might have been brought in
9   in 2022?
10  A    No, ma'am.  Sorry.
11  Q    New nurses who could have come in in 2022?
12  A    No, ma'am.
13          MS. HARPER:  Excuse me just a moment.
14      (Pause.)
15  BY MS. HARPER:
16  Q    Where are -- when the IV bags are delivered from the
17  manufacturer, where are they taken to in that facility?
18  A    They're taken outside of the OR.  So they're stored
19  outside of the operating room area.  But they're stored in
20  boxes of --
21  Q    Uh-huh.
22  A    Approximately 20 to 30 boxes, I believe.  They're stored
23  in a specific spot that is --
24  Q    So in that video that we saw, can we see those boxes?
25  A    Sometimes you can see.  Like, for example, we saw the

1   restocking --

2   Q    Uh-huh.

3   A    -- on the --

4   Q    No, no.  I want to see the boxes.  Where are the boxes

5   that --

6   A    You won't be able --

7   Q    Do they get unloaded off of the pallet?  Where do they --

8   A    You won't be able to see the boxes.  For example, on the

9   24th, we saw the box come out on a cart --

10  Q    Uh-huh.

11  A    -- as he took it to the warmer, opened the box, and did

12  his restocking.

13  Q    And come out on the cart from where?

14  A    There are a number of different angles and different

15  places that have yet to be reviewed --

16  Q    Uh-huh.

17  A    -- on video of where that is.  It's very possible that we

18  could have video coverage of --

19  Q    Yeah, and I don't need the video, I'm just curious as to,

20  you know, is there a closet?  Is there a corner?  Is there a

21  room?  When I get a box and I'm the person running this

22  clinic and I get a box of fresh IV bags, where do I put that

23  box?

24  A    Yeah.  I'm sure there's a location where those are stored

25  specifically, but I'm not sure exactly where those are.

1  Q    Okay.  And is it your understanding that when -- the

2  facility, then, will open the boxes and take some bags to

3  that warmer in the OR hall and some of them somewhere else?

4  I mean, where do they go once we decide to distribute them in

5  the clinic?

6  A    So, the anesthesiology tech will bring the box to the

7  warmer.

8  Q    Uh-huh.

9  A    Open the box.  And his -- he says that he does it the

10  same way every time.  If there are bags in there, --

11  Q    Uh-huh.

12  A    -- he takes those out, places the new bags on the bottom,

13  and then replaces the bags that are -- that are, quote, old.

14  Q    And that's the warmer, but of course we know that's not

15  the only place these things are stored.  So what about where

16  else in the facility do we put IV bags?

17  A    There's IV bags located in a area in the pre-op area.  I

18  don't know exactly what they keep them in.  They're not --

19  they're not warmed.

20  Q    They're not warmed.  Right.  Do you know how many they

21  stock in the pre-op area?

22  A    He says he stocks them as needed.  So, as they get lower,

23  he stocks them up, makes sure there's usually about 20 to 40

24  in there.

25  Q    Uh-huh.  Similar to the warmer?

1    A    I would assume, yeah.

2    Q    And anyplace else where IV bags would be stocked in that

3    facility?

4    A    I don't believe so.

5    Q    You testified that the lidocaine, the bupivacaine, and

6    the epinephrine, that there are some in a medical cabinet

7    there right close to the warmer.  Is that correct?

8    A    Yes, ma'am.

9    Q    Are those drugs kept anywhere else in the facility?

10   A    I would assume that there's a potential storage area for

11   larger amounts of them.  But they -- they remain stocked in

12   that cabinet.

13   Q    On any videos that you have reviewed, have you seen Dr.

14   Ortiz accessing those drugs?

15   A    Yes.

16   Q    Have you seen other doctors accessing those drugs?

17   A    I have not seen any other doctors accessing those drugs,

18   but at this point we are -- I'm sure that -- those are

19   available to anyone on the floor, yes.

20   Q    Uh-huh.  With regard to the anesthesiologist that took a

21   bag -- an IV bag home, is that a common practice?

22   A    I'm -- I'm not sure that I'm qualified to answer that

23   one.  I apologize.  I just -- I don't -- I was not made aware

24   that it was common or not.

25   Q    Okay.  And I think you testified that, in pre-op, we have

1   bags that are not in a warmer; they're room temperature.  Is

2   that correct?

3   A    That's what we're told, yes.

4   Q    And then due to -- for patient comfort, they warm the IV

5   bags during surgery?

6   A    For the OR.  Yeah, for the OR.

7   Q    For the OR?

8   A    Yes, ma'am.  Do you have any idea where this doctor

9   obtained the IV bag that she took home?

10  A    We did not see that on video.

11  Q    And --

12  A    In fact, video --

13  Q    -- do you have --

14  A    I'm sorry.  In fact, video coverage was not there at the

15  time.

16  Q    Right.  Would that doctor have had access to the room-

17  temperature IV bags in the pre-op?

18  A    I would assume, yes.

19  Q    Any logical reason to pick something up from a warmer and

20  then take it home where it would already be cool?

21  A    Oh, I --

22  Q    No idea?

23  A    I can't imagine, no.

24  Q    Surely.  Okay.  You mentioned that it was not common to

25  see doctors accessing the warmer.  Is it a it-never-happens

1    event, or is it just uncommon?

2    A    It was uncommon.  It was relayed to us that it was

3    uncommon.  And we actually saw --

4    Q    Okay.  But it's not that it never happens?

5    A    Correct.  We actually saw on video that it was extremely

6    uncommon.  In fact, I don't know if I can recall seeing any

7    other doctor do that.  It was just relayed to us that it's --

8    it's possible because they have access, --

9    Q    Uh-huh.

10   A    -- but it was relayed to us, that incident that I spoke

11   prior, the anesthesiology tech actually saw Dr. Ortiz do it

12   one time and he thought it was extremely odd.

13   Q    But then that second video that you showed, when Dr.

14   Ortiz grabbed the bag from the warmer, there were people

15   everywhere, were there not?

16   A    Yes, there were.  Yeah.

17   Q    And so it didn't look like anybody were shocked that he

18   was going and grabbing a bag from the warmer, did it?

19   A    On the video, I saw two people walking away from him, and

20   there were two other people down the hall that were

21   conversing.  I don't know if they were paying much attention.

22   Q    When you mentioned that there was a commonality with

23   these events in 2022, is that different from the events that

24   happened in 2021?

25   A    They did not explain what events in 2021 transpired.

1   Q    So they could also be just as common and have just the

2   same sort of symptoms?

3   A    It's possible, yeah.  We're still in the investigative

4   phase of this, so that is something we will be looking into,

5   yeah.

6   Q    Surely.  During the time that Dr. Ortiz has been there,

7   do you know how many incidents that he has had where there's

8   been a cardiovascular event?

9   A    These cardiovascular events, these similar events?

10  Q    Uh-huh.

11  A    Zero.

12  Q    During his entire time there, since the center opened?

13  A    Since May 19th.

14  Q    Okay.  Of this year?

15  A    Of this year.

16  Q    But, of course, he's been there several years.

17  A    Correct.

18  Q    Okay.  So you don't know has he -- has he had any in the

19  past?

20  A    I don't know prior to the May --

21  Q    Okay.

22  A    -- May of this year, no.

23  Q    And with regard to the doctors that were involved in the

24  incidents that you're concerned with now, do you know if they

25  had had prior incidents in the past?

Allgeyer - Cross                          48

1  A    I don't know the full knowledge of that.

2  Q    Okay.  And with regard to the respiratory nurse, I can't

3  remember the name of it, but there's a nurse that's involved,

4  an anesthesia nurse, do you know how many of them have been

5  involved in prior incidents like this?

6  A    I don't know that number.  I'm sorry.

7  Q    Okay.  With this investigation that began May 19th or May

8  24th of 2022, Dr. Ortiz was aware of that; is that correct?

9  A    That's what we were told, yes.

10  Q    Okay.  And had there been an actual finding, or was this

11  still undergoing investigation?

12  A    My understanding is that they spoke about it at their

13  quarterly meeting on the 24th.

14  Q    So Dr. Ortiz was still in a position to present his side

15  and argue as to whether or not that was something that should

16  be blamed on him?

17  A    My understanding was he was not part of the meeting.  So

18  I don't believe he did have the ability.

19  Q    Before discipline is meted out generally, does a doctor

20  have an opportunity to present a defense?

21  A    I would assume, yes.

22  Q    So this was not a done deal at this point?

23  A    Correct.

24  Q    You said that medical personnel had testified that the

25  consequences of him losing his privilege would be

1  devastating.

2  A    Those were the words they used, yes.

3  Q    Would they not be devastating for any doctor to lose

4  their privileges?

5  A    I would assume that's true.

6  Q    Thank you.  When -- you talked about sterile -- sterile

7  procedures and that we don't take a bag from the OR to the

8  warmer.  Is that a bag that has already had the outer bag

9  ripped off?

10 A    My understanding is that anything that leaves the sterile

11 area or goes into a sterile area -- my apologies -- goes into

12 a sterile from nonsterile, no matter if the outer bag has

13 been tampered or removed, --

14 Q    Uh-huh.

15 A    Basically, that patient could have any number of

16 diseases.  MRSA has been brought up to us.  MRSA staph

17 infection can get on the outer bag, which can contaminate

18 whatever bag or item that it is.  Scalpels.  Any type of

19 device you take into a sterile area, you do not bring out and

20 use again.

21 Q    Were -- as you're doing the investigation, as they were

22 doing the investigation and discovered that there were some

23 bags that they thought looked tampered with, were there any

24 findings of empty syringes that might have been used to --

25 A    No, we did not find that in the investigation.

1   Q    Okay.   The outer bag showed signs of tampering.   Any

2   signs on the inner bag?

3   A    So, the inside of the bag has an area that is rubberized.

4   And at this point, it's difficult to see those things because

5   they can reseal.   The point of those ports, my understanding,

6   is that they can reseal.   So, microscopically, we're still

7   investigating.   It's just a matter of the outer bag having a

8   puncture mark.

9   Q    Okay.  So that's something that's still ongoing, you're

10  still looking into?

11  A    Yes, ma'am.

12  Q    With regard to his vacation, that was July 23rd through

13  July 28th, you said.   Does that include a weekend?

14  A    I don't recall.  I imagine.  I think the 28th --

15  Q    Thursday through --

16  A    -- was a Friday.  I don't -- I don't -- I'm sorry, I

17  don't know.

18  Q    Okay.

19  A    I --

20  Q    So you don't know how many actual working days that was?

21  A    I don't.

22  Q    Okay.  But, in all, it was five actual dates?

23  A    I believe that was what his vacation was, yeah.

24  Q    Okay.  So it's not like there was a break of a month,

25  correct?

                        Allgeyer - Cross                    51

1    A    No, ma'am, I --

2    Q    And it -- prior to this, these incidents weren't

3    happening every day, were they?

4    A    No.  They were not.

5    Q    Just one quick clarification.  When you were talking

6    about Government's 6, the August 4th -- no, sorry, when you

7    were talking about the August 9th video, I apologize, you

8    said that --

9    A    August 19th, I think.

10   Q    Oh, was it the 9th?  I thought you said the --

11   A    We have the 4th and the 19th on video.

12   Q    Okay.  But -- so I thought you said the 4th, the 9th, and

13   the 19th.

14   A    We discussed the 9th, but it wasn't shown.

15   Q    Oh, okay.  With regard to the 9th, though, I think you

16   said that Dr. Ortiz was observed placing a bag in the warmer

17   and the same bag was retrieved.  You don't know that it was

18   the same bag, do you?

19   A    No, I think I misspoke.  In fact, I corrected that.  I

20   said a bag was retrieved.

21   Q    A bag?  Not necessarily --

22   A    I don't --

23   Q    -- the same bag, because you just don't know?

24   A    Correct.  It's difficult to see on the -- on the tape.

25   Q    Surely.  Dr. Ortiz, you noted, has some very large debts.

1    Is that correct?

2    A    That's what we have been seeing.

3    Q    So he does not have massive resources at his disposal?

4    A    I don't know his financial situation at this time.

5    Q    Okay.  Do you travel internationally much, Agent?

6    A    I have, yes.

7    Q    How far would $7,000 get you?

8    A    Oh, I -- I think, depending on where you go, $7,000 could

9    last you quite a bit of time.

10   Q    You think you could set up a lifetime in the -- in Panama

11   on that?

12   A    Personally, I know of several places in South America or

13   Central America that $7,000 could last you quite a long time.

14   Q    You must be traveling differently than I do.

15   A    I don't personally go there, but I know what $7,000 could

16   probably get you in several different countries in South --

17   Q    A lifetime somewhere else?

18   A    It can get you a large beginning.  I mean, doctors in

19   different countries are offered licenses without looking into

20   American licenses.

21   Q    Hmm.  So you mentioned two staff members said they were

22   afraid of Dr. Ortiz.  What does that mean, they were afraid

23   of him?

24   A    That's how they relayed it to us.

25   Q    Were they afraid that he would get them fired?

1   A     No --

2   Q     Or were they afraid he would hit them?  What -- what does

3   that mean?

4   A     No indication was given.  They didn't want to speak with

5   us.

6   Q     Okay.

7   A     Because they were afraid of what Dr. Ortiz would do to

8   them.

9   Q     But they didn't say what that meant?

10  A     No, they did not.

11  Q     They did not say that they were afraid that he was

12  violent?

13  A     They -- one of them mentioned that they know of his

14  violent past, yes.  They were aware of his Dallas Regional

15  Medical Center incident.

16  Q     And that incident that you called violent, did he strike

17  anyone?

18  A     I believe he assaulted someone, yes.

19  Q     Who did he strike?

20  A     He made contact with the face mask of the individual

21  telling him to put his mask on.

22  Q     So he was nose to nose with someone?

23  A     They told us he touched.  And again, I'm not a Texas -- I

24  --

25  Q     I'm sorry, but I understood you to say his face was close

1    to their face, that he might have touched them with his face.

2    Is that --

3    A    My understanding is that he came so close that he

4    actually touched their face mask with his face.

5    Q    With his face?

6    A    Yes.

7    Q    Okay.  So, to be clear, he didn't double up his fist and

8    strike anyone?

9    A    We don't have a report of that.

10   Q    Did he -- we don't -- do you have any report that he

11   threatened to double -- that he raised his fists to someone?

12   A    I don't believe that was --

13   Q    So he just got in someone's face?  Was a report written

14   up about that?

15   A    I am not aware if it was or not.  I would imagine it

16   probably would, yes.

17   Q    But from you, from your -- this is just hearsay?

18   A    Yes.

19   Q    You have not seen any report of this?

20   A    I have not seen a report of this, no.

21   Q    Or any disciplinary charges filed against Dr. Ortiz, to

22   your knowledge?

23   A    From that incident, I do not know.

24   Q    Do -- have you seen anything to indicate that Dr. Ortiz

25   lost his privileges at that place because of that?

1  A    Not because of that.

2  Q    Okay.  So, someone told you that someone told them that

3  this happened?

4  A    I believe it was firsthand.

5  Q    The person to whom he was face-to-face told you this?

6  A    I believe there are a number of people that witnessed

7  this incident.

8  Q    I understand the people who witnessed it.  I am asking

9  you, did you talk to the person who says, I was assaulted by

10 him?

11 A    I don't recall who -- which one of the investigators took

12 the case -- the report.

13 Q    All right.  So you haven't even talked to anyone involved

14 in that.  Correct?

15 A    Me, personally?  No.

16 Q    You, personally.

17 A    No.  (clears throat)  Excuse me.

18 Q    With regard to this nurse who says she thinks that Dr.

19 Ortiz drugged her, did you speak with her?

20 A    I did not personally, no.

21 Q    She says she went on a date and then she was at the ER.

22 Is that your understanding?

23 A    Said she had a second drink or part of a second drink, --

24 Q    Uh-huh.

25 A    -- felt woozy, and the last thing -- the next thing she

1    remembers is that she woke up in the ER.

2    Q    Okay.  Did she say that they drew her blood and told her

3    what was in it, that --

4    A    She didn't.

5    Q    -- she had been drugged?

6    A    No.  She didn't talk about that.

7    Q    Any charges filed about this?

8    A    I don't believe any charge has been filed on that.

9    Q    Did she file a police report about this?

10   A    I haven't seen one.

11   Q    And she was in -- she was found in the bar restroom; is

12   that correct?

13   A    That's what she was told, yes.

14   Q    So she didn't even leave the building?  Why did she --

15   well, that's okay.  I don't -- you don't need to answer the

16   why.  I know you can't.

17        There was a 2016 conviction involving the neighbor's dog.

18   Correct?

19   A    (no audible response)

20   Q    Is it your understanding that that dog was shot with a

21   pellet gun?

22   A    Yes.

23   Q    So, like a BB gun?

24   A    A pellet gun and BB guns can be different, depending on

25   what size the pellets are.

1   Q    But not an actual, like, rifle?  Or a pistol?

2   A    Correct.

3   Q    And have you looked at the judgment in that case or the

4   docket notes in that case?

5   A    I've looked at a number of -- the entire appellate

6   decision, I did read, yes.

7   Q    And Dr. Ortiz was ordered to pay the vet bill of the dog;

8   is that correct?

9   A    I believe there was a fine of $3,000.  I don't know what

10  that went to.

11  Q    Uh, --

12  A    I can't remember if that was part of the order.

13  Q    If there's an order, though, that indicates five -- like

14  around five to six hundred dollars in vet bill, would that

15  seem about right?

16  A    If you say so.  I don't --

17  Q    Okay.

18  A    I don't remember.  I'm sorry.

19  Q    And are you aware that Dr. Ortiz was ordered to serve a

20  few -- twenty-some-odd days in jail as part of that?

21  A    I do believe he was given a sentence like that, yes.

22  Q    Okay.  Are you aware of how that sentence was served?

23  A    I believe it was sustained or --

24  Q    No, no.  Served.

25  A    Served?  I don't -- I'm sorry, I don't know.

1    Q    So, or have you heard that he was allowed to serve it on

2    the weekends, and so that on the weekends he didn't have

3    custody of his son he went and served that time?

4    A    Okay.  I -- I don't remember that part of it.

5    Q    Okay.

6    A    I'm sorry.

7    Q    Dr. Ortiz's arrest here on the 14th, did he attempt to

8    flee?

9    A    The arrest on the 14th?  Okay.  No, he was -- he was

10   quite surprised.

11   Q    And cooperative?

12   A    He was cooperative, yes.

13   Q    Where was he when he was arrested?

14   A    He was at a friend's house.

15   Q    Okay.  And you said in a car that is registered to him?

16   A    He was attempting to get into the car registered to him,

17   yes.

18   Q    Uh-huh.  He had lidocaine gel on him?

19   A    Yeah, I don't -- I haven't seen the tube of lidocaine.

20   It was relayed to me that it was a -- it appeared to be non

21   -- non-injectable.

22   Q    Uh-huh.

23   A    In other words, identified, labeled that it was

24   lidocaine.

25   Q    Okay.  Is that used sometimes for -- to relieve topical

1    pain?

2    A    I would assume, yeah.   Lidocaine usually is.

3    Q    Muscle pain?

4    A    Yeah.  Yeah.

5    Q    Any reason that it would be illegal for Dr. Ortiz to have

6    a topical pain reliever gel?

7    A    Oh, no, it was just -- it was notable because it was one

8    of those items used in the crime.

9    Q    And in the crime, was -- when we looked in the IV, was --

10   did it look like it was a gel that had been used?  Because

11   you said this was a non-injectable.

12   A    That's what I was -- relayed -- it was relayed to me that

13   it was not -- it was not syringe.  It didn't have a needle

14   attached to it.

15   Q    Uh-huh.

16   A    So I would -- I would assume that it would be topical.  I

17   don't know, I can't speak to what was used in the crime, if

18   it was topical or injectable.

19   Q    Is there liquid lidocaine that is injectable that exists?

20   A    I do -- I do believe there is.  Yeah.

21   Q    He had $7,000 in cash on him, correct?

22   A    Approximately, yeah.

23   Q    Any reason that he's not allowed to have $7,000 in cash

24   on him?

25   A    No.

1   Q    How many days prior to his arrest had agents been

2   surveilling Dr. Ortiz?

3   A    We had a pole camera up on him for almost a week.  Up on,

4   excuse me, on his residence --

5   Q    Uh-uh.

6   A    -- for almost a week.  Yeah.

7   Q    Did you see any evidence of packing of suitcases?

8   A    No.

9   Q    Do you have any information to show that Dr. Ortiz has

10  recently obtained a new passport?

11  A    We have no information on that.

12  Q    Any indication that Dr. Ortiz had purchased plane

13  tickets?

14  A    No indication.

15  Q    Cruise line tickets?

16  A    No.

17  Q    Do you have any evidence to show that Dr. Ortiz has any

18  ties outside of the United States?

19  A    I don't believe so, no.

20  Q    Any ties outside of the State of Texas?

21  A    I don't think so.

22  Q    Okay.

23          MS. HARPER:  Nothing further, Your Honor.

24          THE COURT:  All right.  Thank you.  Mr. de la Garza?

25          MR. DE LA GARZA:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. DE LA GARZA:

Q   So, the incident at Dallas Regional, my understanding
from your testimony, and you can correct me if I'm wrong, is
that Dr. Ortiz was going into an OR without a mask on?

A   Apparently, he was in the area without a mask on.  I
don't know if he was going into the OR or not, but it was --
it was COVID, so, per protocol, everyone in the hospital is
supposed to wear a mask.

Q   When you say during COVID, we're talking about the COVID
pandemic that's been going on for two years?

A   Yes.

Q   And --

        MR. DE LA GARZA:  Your Honor, I can do this through
a calendar, or the Court can take judicial notice that July
23rd through July 28th, that's a Saturday, Sunday, Monday,
Tuesday, Wednesday, Thursday.  If the Court would take
judicial notice of that, I won't have to ask the agent.

        MS. HARPER:  No objection to that, Your Honor.

        THE COURT:  All right.  Thank you.  I will take
judicial notice of those dates and days of the week.

BY MR. DE LA GARZA:

Q   And in terms of Dr. Ortiz's tax debt, does it appear from
the liens that are in place to him that he is not following
the rules and paying his taxes, as people are required to do

1    so?

2    A    Yes.

3    Q    The nurse who reported that Dr. Ortiz -- she believes Dr.

4    Ortiz drugged her on a date, does she still work at the

5    surgical center?

6    A    I don't believe they worked together for years.  I think

7    they worked together at one point.

8    Q    Okay.

9              MR. DE LA GARZA:  Pass the witness, Your Honor.

10             MS. HARPER:  Nothing further, Your Honor.

11             THE COURT:  All right.  Thank you for your

12   testimony, Special Agent.  You may step down.

13             THE WITNESS:  Thank you, sir.

14        (The witness steps down.)

15             MR. DE LA GARZA:  Your Honor, at this time the

16   Government calls Special Agent Tom Huszcza.

17             THE COURT:  All right.  Special Agent, if you could

18   please raise your hand to be sworn.

19        (The witness is sworn.)

20             THE COURT:  Thank you.  Have a seat.

21             MR. DE LA GARZA:  May I proceed, Your Honor?

22             THE COURT:  You may.

23          TOM HUSZCZA, GOVERNMENT'S WITNESS, SWORN

24                    DIRECT EXAMINATION

25   BY MR. DE LA GARZA:

1   Q    What's your name, sir?

2   A    Tom Huszcza.   H-U-S-Z-C-Z-A.

3   Q    And what do you do for a living?

4   A    I'm employed as a special agent with the U.S. Department

5   of State, Bureau of Diplomatic Security Service.

6   Q    And what do you do as a special agent with the State

7   Department specifically?

8   A    Specifically with the State Department, we investigate

9   U.S. visa and U.S. passport fraud, and then we're responsible

10  for protection of the Secretary of State.

11  Q    Does the Department of State, is that the government

12  agency that issues passports to citizens?

13  A    Yes, it is.

14  Q    Are you aware of how passports are issued, kind of the

15  ins and outs of that process?

16  A    Yes, sir, I am.

17  Q    Do you have access to the records on U.S. passport

18  holders and their travel?

19  A    I do.

20  Q    Did you access those records concerning Dr. Raynaldo

21  Rivera Ortiz with a date of birth of -- ending in 1963?

22  A    Yes, sir, I have.

23  Q    And what can you report to the Court on Dr. Ortiz's

24  international travel?

25  A    Mr. Ortiz travels internationally extensively.  Based on

1    records that I found dating back to 2005 through 2016,

2    there's over forty trips internationally.

3    Q    And his travel stops in 2016; is that correct?

4    A    Yes, sir.

5    Q    Before then, approximately how many times did Dr. Ortiz

6    leave the country?

7    A    Approximately forty times.

8    Q    And what locations did he depart to, according to the

9    records?

10   A    The bulk of the travel goes to Mexico, Vancouver, Canada,

11   and then there's some sporadic travel to Jamaica and

12   Honduras.

13   Q    Was the travel just -- just relegated to Cabo San Lucas

14   in Mexico?

15   A    I believe Cancun as well.

16   Q    Okay.  So, beyond Cabo, right?

17   A    Yes, sir.

18   Q    Okay.  And approximately what were the avenues of

19   transportation, according to the State Department records,

20   for his travel?

21   A    Both flights and cruise -- cruise lines.

22   Q    Has Dr. Ortiz -- is he currently a passport holder, a

23   U.S. passport holder?

24   A    That is correct.  He has been issued a U.S. passport and

25   U.S. passport card.

Huszcza - Direct                                    65

1   Q    Has he reported his passport -- and when -- I'm sorry,

2   let me back up.  What year was he issued that U.S. passport?

3   A    The most recent two travel documents were issued in 2015.

4   Q    And has he reported that passport document stolen or

5   lost?

6   A    No, sir, he has not.

7   Q    Does he also have, as well as a traditional passport, a

8   passport card?

9   A    That is correct.

10  Q    And Agent, in your experience, are there ways for people

11  to leave the country without using a passport or a passport

12  card?

13  A    Yes, sir, there are.

14  Q    And what are those ways?

15  A    Typically, folks departing through a land border

16  crossing, such as Mexico and Canada, or through private

17  aviation, could leave the country without the use of a

18  passport.

19          MR. DE LA GARZA:  Pass the witness, Your Honor.

20          THE COURT:  Ms. Harper?

21                     CROSS-EXAMINATION

22  BY MS. HARPER:

23  Q    Agent -- Huszcza?

24  A    Yes, ma'am.

25  Q    Sorry.  Do you have any personal knowledge of Mr. Ortiz

1    and -- or, as far as what he would or would not do?

2    A    I'm -- I don't understand the question, ma'am.

3    Q    Do you know Dr. Ortiz?

4    A    No, ma'am.  I've never seen him before.

5    Q    Okay.  And the travel that he -- that you have him taking

6    between 2005 and 2016, does it appear to be to traditional

7    vacation destinations?

8    A    Yes, it does.

9    Q    Anything wrong with going to those places?

10   A    No, ma'am.

11   Q    And has Dr. Ortiz, to your knowledge, left the United

12   States since 2016?

13   A    Not to my knowledge, no.

14   Q    Thank you.

15          MS. HARPER:  Nothing further, Your Honor.

16          MR. DE LA GARZA:  Nothing further for Agent Huszcza.

17          THE COURT:  All right.

18          MR. DE LA GARZA:  Thank you, Your Honor.

19          THE COURT:  Thank you.  Special Agent, you may step

20   down.  Thank you for your testimony.

21          THE WITNESS:  Thank you, sir.

22      (The witness steps down.)

23          MR. DE LA GARZA:  Your Honor, at this time the

24   Government rests.

25          THE COURT:  All right.  Ms. Harper?

Motley - Direct                                          67

1          MS. HARPER:  Your Honor, at this time we'd call

2    Kristina -- no, sorry, having one of those days.  Kristi

3    Motley.

4          THE COURT:  All right.  Ms. Motley, if you could

5    please raise your -- well, go ahead and get -- yeah.  Go

6    ahead and raise your hand.

7        (The witness is sworn.)

8          THE COURT:  Thank you.  Have a seat.

9           KRISTI MOTLEY, DEFENDANT'S WITNESS, SWORN

10                      DIRECT EXAMINATION

11   BY MS. HARPER:

12   Q    Ms. Motley, would you please state your name and spell

13   your last name?

14   A    So, my name is Kristi Motley.

15   Q    Oh, Motley.  Sorry.

16   A    As in Crüe.  M-O-T-L-E-Y.

17   Q    And Ms. Motley, how are you employed?

18   A    I'm an attorney.

19   Q    And what type of law do you practice?

20   A    I have complex commercial litigation, business law, and

21   then some family law.  My partner is -- does a primarily

22   family law practice, and I assist when there's finances

23   involved.

24   Q    Are you familiar with Dr. Ray Ortiz?

25   A    I am.

Motley - Direct                                        68

1    Q    How did you come to know Dr. Ortiz?

2    A    In 2015, my law firm was retained to represent him with

3    regard to a protective order hearing and with regard to a

4    possession and custody dispute with the mother of his

5    youngest child.

6    Q    And were you actively participating in that case?

7    A    Yes.

8    Q    Since your participation in that case, have you also

9    become friends with Dr. Ortiz and his family?

10   A    Yes, I have.

11   Q    With regard to the -- well, let me go back.  The custody

12   dispute and the breakup with Dr. Ortiz's prior girlfriend,

13   could that be described as acrimonious?

14   A    Absolutely.

15   Q    Were there charges involved in that breakup of domestic

16   violence against Dr. Ortiz?

17   A    Yes.

18   Q    Was there initially a temporary protective order obtained

19   against Dr. Ortiz?

20   A    Yes.  Yeah.  Her attorneys went to a judge without

21   notifying Dr. Ortiz or his attorneys with an affidavit and

22   got a temporary *ex parte* order.

23   Q    And is that -- that's not uncommon, is it, that the

24   initial protective order is done *ex parte*, correct?

25   A    Yes.  That is common.

1  Q    And then afterwards the accused and his attorneys can get

2  involved and a judge decides whether that protective order is

3  actually justified and whether it needs to be continued?

4  A    Yes.  There's a full evidentiary trial, and then the

5  judge decides whether or not a protective order is -- should

6  be granted.

7  Q    And was such a thing -- did a full evidentiary trial

8  happen with regard to Dr. Ortiz?

9  A    Yes.

10  Q    And what was the judge's finding in that case?

11  A    That the *ex parte* temporary order should be dissolved and

12  that the applicant's protective order motion should be

13  denied.

14  Q    So would it be fair to say that the judges found the

15  allegations of domestic violence not to be credible?

16  A    Ultimately, after three days of trial on that issue, and

17  possession schedule, and whether or not he was informally

18  married to the petitioner at the time, there was no finding

19  of family violence.  And the final order in the case would be

20  required to have that in there if there were such a finding.

21  No such finding was in the final order.

22  Q    And to your knowledge, has Dr. Ortiz ever been convicted

23  criminally of domestic violence against that partner?

24  A    He has not.

25  Q    With regard -- are you familiar with Dr. Ortiz's ex-wife?

Motley - Direct                                70

1   A    Yes.

2   Q    Have you spoken with her recently?

3   A    I have.

4   Q    There was an allegation that there was some domestic

5   violence between Dr. Ortiz and his ex-wife in 2005.  What do

6   you know about that allegation?

7   A    That there was no domestic violence.  In fact, that they

8   were married for 15 years, several years after that

9   allegation in 1995.  They got divorced in 2001.  There was no

10  physical violence between the two in the entirety of that 15

11  years.

12  Q    And that is what she reported to you, correct?

13  A    She also reported that the allegations that those charges

14  went away because of money paid to her was absolutely not

15  true, and in fact they settled the case at the divorce, and

16  not even child support was ordered because they got joint

17  custody together.

18  Q    Okay.  And to your knowledge, was any money paid to the

19  mother of his teenage son to make any charges go away?

20  A    Although repeated attempts by her were made to obtain

21  money from Dr. Ortiz and claim that they were married, all

22  such things were denied after several days of trial.  No

23  money to the mother of his youngest child has ever been given

24  to her, other than child support, which is always ordered.

25  Q    During the time that you have known Dr. Ortiz, have you

1    ever known him to be volatile or violent?

2    A    No.

3    Q    Do you know his oldest daughter, Christina?

4    A    I do.  I have -- I actually have been to both his

5    daughters' weddings.

6    Q    With regard to Christina, she is not here today.  Is it

7    your understanding that she's unable to be here because she's

8    pregnant and she fell last week and there were some concerns

9    that she needed to stay close to home?

10   A    Yes.  She was actually hospitalized.  But she's now home,

11   but it is not safe for her to, you know, have a stress like

12   this.

13   Q    Dr. Ortiz's children, are they all here in the North

14   Texas area?

15   A    Yes.

16   Q    Does Dr. Ortiz currently have a live-in romantic partner?

17   A    Not that I know of.

18   Q    His house.  Have you been to his house?

19   A    Yes.

20   Q    Is it large enough to accommodate more than one person?

21   A    Yes.

22   Q    His daughter Christina, is it your understanding that she

23   assists him in taking care of the house and taking care of

24   her younger brother?

25   A    Yes.

Motley - Direct                                       72

1   Q    Does she live close by?

2   A    Yes.

3   Q    Do you have any information to indicate that Dr. Ortiz

4   might have the ability or desire to flee the jurisdiction,

5   rather than respond to these charges?

6   A    No.

7   Q    Were you informed that there was something going on with

8   the Medical Board before he was arrested?

9   A    I've been informed of like the recent August hearing he

10  had and where the agreed order came from, yes.

11  Q    Okay.  Do you have any concerns that Dr. Ortiz might be a

12  danger to the community?

13  A    No.

14  Q    Is it your understanding that he no longer has access to

15  a medical license?  Or do you know whether he has a medical

16  license?

17  A    I know that it was temporarily suspended by the Medical

18  Board, yes.

19  Q    Okay.  Can -- with a temporary suspended medical license,

20  as far as you know, can he work in a hospital?

21  A    No.

22  Q    Can he prescribe medication?

23  A    No.

24  Q    Have you looked at the complaint in this case?  Have you

25  read it?

Motley - Direct                               73

1    A    Yes, I have.

2    Q    And you recognize these are very serious allegations?

3    A    Absolutely.

4    Q    And even understanding how very serious these allegations

5    are, is it your opinion that Dr. Ortiz will come to court as

6    required to contest these allegations?

7    A    Well, I've also listened to the testimony here today, and

8    while the prosecution is making big allegations about whether

9    or not he'd be a flight risk or et cetera, I know in the fact

10   -- for the fact when he had to report to jail repeatedly

11   every other weekend he was always there on time, followed the

12   judge's instructions, complied with all the probation

13   requirements.  So he has always been compliant.

14        All of his family is here.  He's about to have a

15   grandson.  There is no way he's going anywhere.  And that's

16   based on my several years of knowing him personally and

17   professionally.

18   Q    Thank you very much.

19        MS. HARPER:  I have nothing further for this

20   witness, Your Honor.

21        THE COURT:  All right.  Mr. de la Garza?

22        MR. DE LA GARZA:  Ms. Martin is going to handle

23   cross-examination, Your Honor.

24        THE COURT:  Okay.  Ms. Martin?

25        MS. MARTIN:  Thank you.

1                         CROSS-EXAMINATION

2    BY MS. MARTIN:

3    Q    Ms. Motley, you said you sometimes engage in family law

4    but you're really the financial side of it?

5    A    More or less.

6    Q    Okay.  So do you --

7    A    I mean, I do family law.  I get brought in when -- when

8    there are, you know, like, business valuations, things like

9    that.  In this case, a baseless informal marriage allegation,

10   so I was brought in for that purpose initially.

11   Q    So the baseless allegation somehow involved the finances?

12   A    Well, that's, yes, because she wanted his finances.

13   Q    So did he disclose all of his finances to you?

14   A    I just know what's disclosed -- is disclosed in discovery

15   for, you know, the case.  So that was in 2015.

16   Q    So presumably he disclosed all his finances to you?

17   A    That's not what I said.  I told you I know what's

18   requested in discovery and what's produced in discovery.

19   That's what I know.

20   Q    So as his attorney, you're saying you're not sure what

21   his finances were?

22   A    I'm saying --

23   Q    You just know what he disclosed in discovery?

24   A    I know what's required in discovery.  Requests for

25   production are given.  You can make objections.  You produce

Motley - Cross                                                75

1    items, et cetera.  So I know -- I review things that are

2    produced in discovery.

3    Q    Okay.

4    A    I don't know what I don't know, I guess is my point to

5    you.

6    Q    Okay.  So you don't know, even though you were brought on

7    for the finances, you don't know what his finances were or

8    are?

9    A    Okay.  I'm not --

10   Q    That's a question.

11   A    -- his attorney right now.  Okay.  I was telling you, I

12   reviewed the documents that were produced in discovery.

13   Q    Okay.  You didn't answer my question.  Even though you

14   were brought on for finances in representing him, whenever it

15   was, your testimony is that you just know what he did in

16   discovery, you don't know what his finances were?

17   A    Respectfully, I wasn't brought on for the finances

18   initially.  It was for the protective order and for the

19   informal marriage claim.  So I briefed those issues.

20         And actually in that case the parties agreed that the --

21   the huge exploration into people's businesses, et cetera, was

22   not going to occur until and if the -- a marriage claim was

23   established, because then it doesn't matter, because if it's

24   regard to the child, the finances don't matter.  It's only if

25   there's a marriage to separate and, you know, a property

Motley - Cross                                      76

1    division to be made.  So we never got to that point in my

2    case --

3    Q    So --

4    A    -- with him.

5    Q    Okay.  Do you know what his finances are?

6    A    No.

7    Q    Did you know what his finances were when you were his

8    lawyer?

9    A    No.  Not -- other than what I reviewed.  Okay.  So I had

10   certain bank accounts.  All right.  But I -- we didn't get

11   into like his business, et cetera.  So we had to review tax

12   returns, et cetera, for child support purposes.

13   Q    Okay.  And do you recall how many bank accounts he had?

14        MS. HARPER:  Your Honor, I think we may be getting

15   into privileged information, and I certainly don't want to

16   force Ms. Motley to release anything subject to attorney-

17   client privilege.

18        MS. MARTIN:  Your Honor, I believe the questioning

19   brought up the actual representation of him in a family law

20   matter, and that's what I'm asking about.

21        MS. HARPER:  I did not ask anything about finances

22   or her review of discovery, Your Honor.

23        MS. MARTIN:  Your Honor, she opened the door by

24   asking about the representation of the Defendant.

25        THE COURT:  Ms. Martin, what was your most recent

1    question?

2           MS. MARTIN:  About whether she as his lawyer knew

3    about his finances during the representation.

4           MS. HARPER:  I think the actual -- the question was

5    specific about his checking accounts, Your Honor.

6           MS. MARTIN:  Yes.  What -- what accounts did you

7    know about?

8           THE COURT:  If Ms. Motley has a concern about

9    whether she should be breaching attorney-client privilege,

10   she can --

11          THE WITNESS:  I --

12          THE COURT:  -- raise that in answering the question.

13          THE WITNESS:  Right.  So, in 2015 and '16, I saw

14   some -- like, there's not a lot of checking accounts that I

15   recall reviewing.  So I don't remember much about them.  I

16   don't remember thinking -- let me just say, I have

17   represented people in the past that have a lot more checking

18   accounts than Dr. Ortiz, okay?  It's pretty -- his finances

19   seemed pretty straightforward.  So I didn't -- I didn't find

20   anything surprising.  I'm not sure exactly what you're asking

21   me for.

22   BY MS. MARTIN:

23   Q   Just whether you know how many checking -- knew how many

24   checking accounts he had.

25   A   I -- I mean, I don't know what I don't know.  I reviewed

1  like two or three.  Okay.

2  Q    Okay.  Were you aware of his tax problems?  Did you

3  represent him in his tax problems?

4  A    No.  I am not a tax lawyer.

5  Q    Okay.  So were you -- but were you aware of those when

6  you were doing his finances for his divorce, about his tax

7  liens?

8  A    I think they arose in 2015-16, so I don't -- I wasn't

9  really involved in that at the time.

10  Q    And I believe you said a full evidentiary trial happened.

11  Is that correct?

12  A    Yes.

13  Q    Did -- during that evidentiary trial, did a woman named

14  Ms. Bogdan appear?

15  A    Yes.

16  Q    And who is Ms. Bogdan?

17  A    Her name is Roxanne Bogdan.  She's a former neighbor.  I

18  also took her deposition at that time.

19  Q    Well, it -- what was her role there?

20  A    That's a good question.

21  Q    Well, the Defendant was convicted of shooting her dog.

22  Is that correct?

23  A    I'm sorry.  Would you repeat that, please?

24  Q    This Defendant was convicted of shooting her dog, wasn't

25  he?

Motley - Cross                              79

1    A    Not at the time.  Okay.  It was an allegation that was

2    made.  That trial had not occurred when we had -- went to

3    final --

4    Q    Oh, so whatever decision was made in that court didn't

5    take into account that he was convicted of shooting a dog?

6    A    So, they knew about the allegations, and the judge

7    definitely took those allegations into consideration, but --

8    but still didn't believe them, and then gave 50-50 possession

9    of the child to both parties.

10   Q    But the Defendant was convicted of shooting her dog.

11   Correct?

12   A    That's my understanding, yes.

13   Q    Do you dispute that he was convicted of shooting her dog?

14   A    I just said it's my understanding, yes.

15   Q    Okay.  Do you know that -- that the Fifth District Court

16   of Appeals actually issued an opinion affirming the

17   conviction?

18   A    Yes.

19   Q    So that's what your understanding is based upon?

20   A    Yes.

21   Q    Did you know that that was in retaliation for her

22   assisting his ex-girlfriend or the mother of his child?

23   A    Actually, no, I -- I don't believe that.

24   Q    You don't believe it?

25   A    I don't -- I don't believe any shooting was in

Motley - Cross                                80

1    retaliation for anything.  I mean, I have my own bases, but

2    all I can say is I know he was convicted.  So, --

3    Q    Have you read the Fifth District Court of Appeals

4    opinion?

5    A    Uh-huh.

6    Q    Okay.  And so you know that they -- the Fifth District

7    Court of Appeals found that the motive for shooting the dog

8    was her assisting the former --

9    A    Actually, I don't recall that, that exact language.  I

10   know that the Medical Board put that in their motion

11   originally, and I know that's what everybody's reporting off

12   of.

13   Q    Okay.  So you wouldn't dispute, though, that it was

14   because the Appellant -- that the Fifth District Court of

15   Appeals found it was because the Appellant blamed Bogdan for

16   the breakup and that they had animosity between them after he

17   split from Ms. Abel?

18   A    I believe the opinion says what it says.

19   Q    Okay.  Do you often become close friends with your

20   clients after you represent them?

21   A    Sometimes.

22   Q    Do you believe that's appropriate?

23   A    After you're done representing them?  Yes.

24   Q    And your representation is completely terminated?

25   A    As of right now, yes.

Motley - Cross                              81

1    Q    Do you anticipate that you're going to be hired again?

2    A    It really depends what happens here today.

3    Q    Would that be appropriate, for you to, after you're very

4    good friends?

5            MS. HARPER:  Your Honor, I think --

6            THE WITNESS:  Absolutely.

7            MS. HARPER:  -- this is rather far afield of the

8    reason we're here.

9            THE COURT:  Ms. Martin?

10           MS. MARTIN:  Your Honor, I'm just challenging her

11   credibility.  She is having a hard time answering questions

12   directly.

13           THE WITNESS:  If I am, I'm -- that's not my intent.

14   I'm trying to address what she's asking me.

15           THE COURT:  I mean, I think I take your point, Ms.

16   Martin.  You can move on.

17           MS. MARTIN:  Thank you, Your Honor.

18   BY MS. MARTIN:

19   Q    Now, you testified that you spoke with the Defendant's

20   ex-wife.  Is that correct?

21   A    I communicated with her.

22   Q    When was that?

23   A    Yesterday or Saturday.

24   Q    Why did you communicate with her?

25   A    Because I wanted to know.

1    Q    Did anybody direct you to communicate with her?

2    A    You know, I knew the allegations.  I remember -- I

3    remember seeing the allegations in the Medical Board

4    complaint against him, and then that -- and then in the

5    allegations in the press that, you know, he had beaten his,

6    you know, his first wife, et cetera.  So I -- I didn't think

7    that was true based on my prior involvement with her, so I

8    wanted -- and then I had been asked to testify here, so I

9    wanted to know.  I asked her directly so that I could testify

10    about it.

11    Q    Okay.  What other investigation have you done?

12    A    That, and then I followed up with his daughter about her

13    health and the pregnancy and the issues with that and the

14    dangers of her, you know, coming to court today.  And I --

15    and I talked to her, and I confirmed, you know, my personal

16    observations about where his family is located, for example,

17    in North Texas, things like that.  Basically, the things that

18    have been asked of me today, I tried to confirm independently

19    so that I could testify to them honestly.  And so --

20    Q    And you said you talked to his daughter and she -- how

21    far along is she?

22    A    I want to say seven months.  I think she's due around --

23    before Thanksgiving-ish.

24    Q    And she fell recently?

25    A    I think it was last -- last week or the week before,

Motley - Cross                                                    83

1   timing.  I think it was last weekend she was hospitalized.

2   And she stayed at least one night.  But luckily they -- the

3   baby's fine and so she was able to come back home.

4   Q    Is she on any kind of bedrest?

5   A    I don't know the answer to that.  I know she's not -- I

6   don't think it's bedrest-bedrest, but like take it easy,

7   don't -- remove yourself from stressful situations, I think.

8   Q    Remove -- I'm sorry.  You said remove yourself from

9   stressful situations?

10  A    Yeah, like just be as calm as you can, yeah.

11  Q    Okay.  Have you socialized with the Defendant?

12  A    Yeah.  I haven't socialized with him in the past year as

13  much, but I have -- but -- I take that back.  So, in end of

14  May, early June, my stepdaughter got a cool award and I was

15  talking to him about it.  And he's like, we should -- we

16  should take her out -- take her out to celebrate.  So my

17  husband and my daughter and I went to dinner with him.

18  Q    Where did you go to dinner?

19  A    I don't live in North Dallas, so it was a -- a steak

20  restaurant, I believe.

21  Q    Did you order any alcohol?

22  A    Actually, no.

23           MS. HARPER:  Your Honor, the relevance of this?

24           MS. MARTIN:  Your Honor, I'm about to ask whether

25  the Defendant ordered any alcohol.

Motley - Cross                                            84

1              THE WITNESS:  Well, the answer is no, so --

2              THE COURT:  Okay.

3              MS. MARTIN:  Your Honor, I believe the Pretrial

4    Services report has some interesting information, and I'm

5    just trying to follow up on that.

6              THE COURT:  All right.

7    BY MS. MARTIN:

8    Q    So he didn't order any alcohol?

9    A    Dr. Ortiz?  He may have ordered a drink.  What he does is

10   orders a drink and then doesn't drink it.  It's like a joke

11   every time we go.  So he orders a drink and it sits there and

12   he doesn't drink it.

13   Q    So he orders drinks at restaurants and doesn't drink it?

14   As a joke?

15   A    No, it's like we make fun of -- we kind of make fun of

16   him.  I'm like, why do you even bother ordering a drink?  You

17   know, I mean, just -- it's just kind of a joke.  Because

18   usually, I mean, he just doesn't drink a lot.  And he's

19   around people who do.  You know, I mean, so he's just, I

20   think, over years of -- I'm not going -- I don't want to

21   speak for him, but it's my observation that over the years

22   he's observed what alcohol can do to people and he's just not

23   a big drinker.

24   Q    Okay.  And how often do you socialize with him?

25   A    Again, that was -- that was the last time I had

1   socialized with him.  And then I met with him a couple of

2   weeks ago and had lunch with him and my husband.

3   Q   Okay.  But prior to that event where your daughter won an

4   award, had you socialized --

5   A   It had been several months that I'd, you know, socialized

6   with him.  But we have been involved in a case, and through

7   -- I think it got -- finally got finalized in April.

8   Q   And that was the divorce proceeding?  Or the --

9   A   No.

10  Q   I'm sorry.  The custody --

11  A   It was an additional custody modification situation.  So,

12  yeah.

13  Q   So you didn't -- you weren't socializing during that

14  time?

15  A   Not really, no.

16  Q   But he's not a big drinker?

17  A   No.

18  Q   Okay.  You socialize with him enough to know that he's

19  not a big drinker?

20  A   Yes.

21  Q   Okay.  So --

22  A   All I -- all I can talk about is my personal

23  observations, right?

24  Q   Right.

25  A   I don't know what he does outside of me, you know, et

Motley - Cross                                              86

1    cetera.  But I'm -- it's enough that it's been a joke with

2    us.  You know, we make fun of him, like why do you even

3    bother ordering a drink, you know.

4    Q    You socialized, then, quite a bit, with him quite a bit

5    to be able to make that observation?

6    A    In the past I have, but I hadn't socialized -- like twice

7    this year, okay?  And then before that it had been a couple

8    years.

9    Q    Okay.  And you went to his daughters' weddings; is that

10   correct?

11   A    Yes.

12   Q    Do you socialize with the family other than that?

13   A    I talk to his daughter, you know, every once in a while,

14   you know, just catch up, how she's doing, things like that.

15   Q    Do you assist him with his interactions with the Medical

16   Board and his discipline with the Medical Board?

17   A    Other than to assist his -- his representation for that,

18   you know, if they have any questions about what's happened

19   with the family cases, et cetera.  So, for example, showing

20   them the orders where the protective orders are denied and,

21   you know, talking to them about what happened and that kind

22   of thing.

23   Q    Do you --

24   A    But no, I do not represent them in the Medical Board.

25   Q    Okay.  And prior to today, did you know of the incident

1   at the hospital where he got in an administrator's face?

2   Were you aware of that incident?

3   A    No.

4   Q    So today is the first you had heard of it?

5   A    If it was in the complaint, your complaint, then I may

6   have read it, but I don't recall it specifically, no.  But I

7   hadn't heard of it previously to that.

8   Q    Did that surprise you?

9   A    Yes.

10  Q    Do you find it -- would you find it threatening if

11  somebody got nose to nose with you?

12  A    I don't know.  I have a six foot seven father with a bad

13  temper, so I'm not easily intimidated, so, I mean, you know,

14  I don't -- I don't know.  And I'm an attorney, so I'm

15  probably not the right person to ask about that.  I've --

16  I've had people in my face many times.

17  Q    And it's not threatening to you?

18  A    I just generally step back and deal with it, you know.

19          MS. MARTIN:  No more questions, Your Honor.

20          THE COURT:  Okay.  Ms. Harper?

21          MS. HARPER:  No, nothing further, Your Honor.  Thank

22  you.

23          THE COURT:  Okay.  Ms. Motley, thank you for your

24  testimony.  You may step down.

25          THE WITNESS:  Thank you, Your Honor.

1       (The witness steps down.)

2              MS. HARPER:  Your Honor, I just have a proffer.

3              THE COURT:  All right.

4              MS. HARPER:  I have spoken with Mr. Ortiz -- sorry,

5   Dr. Ortiz's daughter, Christina Wolf.  Christina also told me

6   that she was unable to make it here today due to issues

7   related to her pregnancy.  However, if the Court were to

8   decide that a third-party custodian were to be needed, she

9   would be willing to come to court to make the assurances

10  required.  And I have discussed the duties and obligations of

11  a third-party custodian with her, if that is something the

12  Court feels is necessary.

13      Ms. Wolf is 33 years old.  She and her husband live 20

14  minutes away from Dr. Ortiz.

15      For the last eight years, Christina Wolf has been

16  employed as Dr. Ortiz's personal assistant.  She's been

17  helping him care for her younger brother, who's a teenager

18  and with whom he shares custody.  She's been helping in the

19  mornings get him ready for school and getting him to and from

20  school and any other errands that need to be done.  She also

21  helps Dr. Ortiz in taking care of his house and running any

22  other errands that need to be done.

23      She's familiar with Dr. Ortiz's house.  She says that she

24  and her husband are willing to move to that residence if

25  that's needed to act as a third-party custodian, as her house

1    is really too small to add an extra person.

2         She is -- she would testify that all of her siblings are

3    here in the Dallas-Fort Worth area, that it is a very close

4    family, that Dr. Ortiz is a very loving and caring father and

5    involved with all of his children.  That he's looking forward

6    to her first child that is due in early December.

7         She does not believe he is a risk of flight, as she does

8    not think that he has anywhere to go or any resources to go

9    anywhere or any reason to go.

10        She also does not feel any concern about danger as far as

11   living with him.  She does not know her father to be volatile

12   or to be violent.

13        And she says that if, again, if the Court needs her to,

14   she is willing to inform the Court of any infractions to

15   pretrial release.

16        And that's all I have as far as evidence, Your Honor.

17            THE COURT:  All right.  Thank you.

18        Mr. de la Garza, any rebuttal evidence?

19            MR. DE LA GARZA:  Your Honor, yes, we do, and I will

20   proffer this.  It's Government's Exhibit 8.  I think Ms.

21   Harper has a copy of it.  I would proffer to the Court that

22   Government's Exhibit 8 is a picture of a money clip that was

23   found when the Defendant was arrested on him on September

24   14th of 2022.

25        At this time, we would offer Government's Exhibit 8 into

1    evidence.

2              MS. HARPER:  Your Honor, I don't object to the

3    offering.  I would just -- well, it's fine.  I don't see how

4    it rebuts what I've offered, but yes, that's fine.

5              MR. DE LA GARZA:  Your Honor, may we approach?

6              THE COURT:  You may.  Government Exhibit 8 will be

7    admitted.

8              MR. DE LA GARZA:  Thank you.

9         (Government's Exhibit 8 is received into evidence.)

10             MR. DE LA GARZA:  And for record purposes, it's a

11   money clip that reads, He who pays the bills also makes the

12   rules.  And that's in response to the proffer that was made

13   concerning his daughter as third-party custodian.

14             THE COURT:  All right.  Then, if there's no

15   additional evidence, I will hear argument.

16        You know, actually, first, though, I don't think I have

17   copies of most of the Government's exhibits.

18             MR. DE LA GARZA:  Yes, Your Honor.  I apologize.  We

19   were -- I wanted to be -- and I will --

20             THE COURT:  Sure.  Sure.

21             MR. DE LA GARZA:  -- find the file that the agent

22   had that was up there.

23        (Pause.)

24             MR. DE LA GARZA:  We're getting two.  I actually

25   wrote on my copy.  I apologize.  Thank you.  Have a clean

1    copy here.

2            THE COURT:  All right.  Great.  Thank you.

3            MR. DE LA GARZA:  1 through 7.  Admitted 1 through

4    8.

5            THE COURT:  Okay.  Very good.

6            MR. DE LA GARZA:  And Your Honor, here is the --

7    this, which is Government's 6 and 7.

8            THE COURT:  Okay.  Very good.  You can hold on to

9    that.

10        Okay.  Well, I will hear argument, Mr. de la Garza.

11           MR. DE LA GARZA:  Your Honor, I think the evidence

12   has established that Dr. Ortiz is a medical terrorist.  He

13   plants IV fluid bag bombs in a facility that cares for

14   innocent people just seeking medical treatment.

15        His ideology is this.  He is mad.  He is angry.  He

16   thinks he's been wronged.  He's going to strike back at

17   innocent people.  He's going to strike back at his

18   colleagues.  He's going to strike back at the surgery center

19   which has paid him good money for a while.

20        He's violent.  And the Court has heard the testimony.

21   He's retaliatory.  The Government's exhibit which has the

22   Court of Appeals opinion directly found that.

23        His neighbor, who testified against him and his

24   interests, he shot her dog, and that's what the Court found,

25   in retaliation.

1    The Court has heard evidence from employees at the center

2    or about employees at the center that believe that they're

3    scared of him.  And I think in this case, he's retaliated

4    back in 2015, 2016, he's doing the same thing here, Your

5    Honor, in this case.  He's been accused of something at the

6    center regarding his care, and he's retaliating.  He's

7    repeating the exact conduct that he did six or seven years

8    ago.  And there's no reason for this Court not to think that

9    he won't do the same thing to witnesses and other people

10   involved in this case.

11       For that reason alone, Your Honor, we think he should be

12   detained.

13       The nature of the allegations in this case are extremely

14   serious and heinous.  A physician, who's sworn to do no harm,

15   is planting poison bombs at the facility, just waiting to go

16   off.  That's incredibly callous, Your Honor.  Callous

17   conduct.  Life-threatening.  And in one case, a woman may

18   have died, another doctor may have died as result of this.

19       These charges carry serious consequences, so the Court's

20   aware.  In the case, if a death is proved, it's life.  If

21   it's a serious bodily injury, it's up to twenty years.

22   Serious consequences for these offenses.  Therefore, the

23   nature of the offense on its own says the Defendant should be

24   detained.

25       His background, Your Honor, is he has no reason not to

1  run.  His house is encumbered by a federal tax lien.  He's

2  apparently indigent, according to what he represented to the

3  Court.  But I think there may have been some

4  misrepresentations regarding that, and I'll get into those in

5  a second.

6      His license, his vocation is in jeopardy.  He's not going

7  to practice medicine again.  There's no reason for him not to

8  flee.

9      As Tom Huszcza, the special agent from DSS said, he can

10 slip across the southern or the northern borders as a walker

11 and be gone.

12     His passport and passport card, even though the Pretrial

13 Services report he reported they were taken by his

14 girlfriend, they have not been reported lost or stolen.

15     I think in the Pretrial Services report he mentioned he

16 traveled once a year to Mexico from 2007 to 2016.  Special

17 Agent Huszcza relates it is much more than that.  Much more.

18 And identified other countries besides Mexico he's traveled

19 to.

20     These small things add up, Your Honor.  I think he's

21 being dishonest to the Pretrial Services officer, for

22 whatever reason.  I think that shows that he's willing to be

23 [dis]honest to them, he's willing to be [dis]honest and -- to

24 the Court, disobey Court's rules.

25     Very compelling also, Your Honor, is his tax debt.  He's

1  not following the rules.  He's not paying his taxes.  The

2  Court knows from the Pretrial Services report that he makes

3  $25,000 a month.  At least that's what he reported to the

4  Court.  But yet for the last -- back 'til 2015 through 2022,

5  he's not paying his taxes.  He's not following the rules.

6  Again, another indication of not following the rules and why

7  he is a flight risk.

8      Probable cause, Your Honor, I think we've established

9  that.  I'm not going to argue that too much.  Most compelling

10 in the Government's case for probable cause is Government's

11 Exhibit 6, which is Dr. Ortiz walking in a hallway, all by

12 himself, nobody else around.  Puts an IV bag in the warmer,

13 and then looks around.  And the Court can watch that.

14 Incredibly suspicious.  He doesn't just walk up there, put it

15 in there, and go about his business, but he stops and he

16 looks once, twice, three, four, five times around to see who

17 saw him do that.  That's very compelling evidence, Your

18 Honor, we think for probable cause.

19      But going back for detention, Your Honor, we believe he's

20 a danger to the community.  He's already established that by

21 his conduct at the surgery center.  And we believe he's a

22 flight risk because I think he's been dishonest with the

23 Court.  He's not willing to accept anybody's rules but his

24 own.

25      The money clip that was admitted in Government's Exhibit

1  8 I think shows that he would not accept a third-party

2  custodian's supervision, especially not his daughter, the

3  daughter that appears to be pretty linked to him.  She's

4  acting as his personal assistant.

5       It's also a daughter, and this is her father.  It's hard

6  to believe that a father might -- with this -- of this

7  character, who's committed this kind of conduct, is going to

8  follow a woman who's seven months pregnant, her directives,

9  that she's going to be adequate.  Nothing against her, Your

10 Honor.  It's just, it's a little bit pushing -- pushing

11 belief to believe that she's going to be in a good spot to do

12 that, especially with a man who has been violent towards

13 people who've wronged him, who doesn't pay his debt, who

14 lies.  And that money clip says, He who pays the bills makes

15 the rules.

16      I think he is -- makes his own rules in life.  He doesn't

17 pay his taxes.  He injures patients.  He lashes out at people

18 who provide him his employment.  He denies things.  He

19 misrepresents things to the Court.

20      Your Honor, we would ask that he -- probable cause be

21 found and that he be detained pending trial because he is

22 nothing short of a medical terrorist.

23           THE COURT:  Thank you.  Ms. Harper?

24           MS. HARPER:  Thank you, Your Honor.  While I'm very

25 appreciative of Mr. de la Garza's preview to his closing

1    argument at trial, we're not here for that.  It's a detention

2    hearing and a probable cause hearing.

3        I don't have anything to say with regard to probable

4    cause.  My focus is going to be on detention.

5        As the Court knows, the Government has the burden to

6    prove by clear and convincing evidence that Dr. Ortiz is a

7    danger to the community today and a flight risk going forward

8    that he won't come to court.

9        Mr. de la Garza has thrown around a lot of very lovely,

10   inflammatory terms.  Medical terrorist.  Poison bombs.  But

11   the fact of the matter is Dr. Ortiz, his medical license has

12   been suspended.  He is no longer practicing.  So even if one

13   were to assume that everything that is in the Government's

14   complaint is true, which I do not, but even if one were to,

15   these are not things that Dr. Ortiz is able to do today, so

16   these are not things that should go to the concerns about

17   need to protect the public from future crimes of Dr. Ortiz,

18   is there a danger to the community?  We're concerned about

19   present conduct and future conduct.

20       Dr. Ortiz has strong ties to this community.  He has

21   lived his entire life in the State of Texas.  He's lived in

22   the Dallas area for the last 29 years.  He's been in the same

23   residence since 2005.

24       He has four children here in the area, Your Honor.  Three

25   who are adults, and one teenager.  All of them living in

1   North Texas, and all of them to whom he is very close.  And

2   his teenage son, he shares joint custody with his mother and

3   is very involved in that child's life.

4       With regard to his finances, Your Honor, as the Court is

5   aware, Dr. Ortiz is currently unemployed.  That does not mean

6   he is unemployable.  He has an advanced degree.  He's a very

7   intelligent man.  I feel quite confident that, when ordered

8   by the Court to seek and maintain employment, that he will be

9   able to do so, though it will not be in the medical field.

10   But he does not have an excess of funds at this time for

11   which to flee, the type of thing that we would be concerned

12   about.

13       He has little cash on hand.  I'm sure the Government just

14   seized the $7,000 that he had.  He has a good amount of debt

15   due to the extensive custody battle that he had.  And also,

16   of course, we have this IRS lien.  And the IRS lien, Your

17   Honor, when people are tasked with paying bills and they have

18   to pay for private school that has been ordered for their

19   child, they're having to pay attorneys' fees, both with

20   regard to a very acrimonious custody lawsuit plus things with

21   the Medical Board, the last thing people pay is their taxes

22   because that's the one thing that we can put off.  That does

23   not indicate a complete disrespect for the law.

24       Mr. Ortiz -- or, I'm sorry, Dr. Ortiz's criminal history,

25   actual criminal history, consists of one prior conviction of

1   shooting a dog with a pellet gun.  And I don't mean to say

2   that that's okay, but what I -- what is important is that he

3   was given probation on that, a condition of probation that he

4   serve 29 days in custody.  Because of the shared custody with

5   his son and because of his work obligations, the court felt

6   it was appropriate to allow him to do that time in custody on

7   weekends when he did not have custody of his son.  And he

8   did.  Dr. Ortiz reported as required and completed every

9   obligation of his probation.

10       The money clip, I would hate to be prosecuted for some of

11   the cutesy things that I've got sitting around my office that

12   my family has given to me.  Dr. Ortiz tells me that money

13   clip was a gift from his daughter that she purchased on a

14   Disney cruise.

15       Again, Your Honor, the issue is that there is no

16   condition or combination of conditions that the Court can set

17   to readily assure the Defendant's appearance at court as

18   required and the safety of the community.  I personally

19   believe that the Court could set the standard conditions of

20   release with Dr. Ortiz and that would be more than sufficient

21   to assure both.

22       However, if the Court has additional concerns, Dr. Ortiz

23   is certainly willing and the options are there to do location

24   monitoring.  He can have a third-party custodian if that's

25   required, though I don't think it would be necessary.  And at

1  the very punitive end, if the Court were to order home

2  confinement, that would also be an option.

3       So, respectfully, Your Honor, I would argue that there

4  are conditions that the Court could set to ensure Dr. Ortiz's

5  appearance at court and the safety of the community, and we

6  would ask that the Court do so.

7            THE COURT:  All right.  Thank you.

8            MS. HARPER:  Thank you.

9            THE COURT:  Mr. de la Garza, any rebuttal argument?

10           MR. DE LA GARZA:  Your Honor, I understand Ms.

11  Harper's arguments here.  And I understand some of the

12  witness testimony and the casting of things.  But when we

13  back up to what happened -- and I believe what Ms. Motley

14  testified back in 2015 -- I mean, the things that we've heard

15  about weren't in play back then.  And the things that have

16  developed now control what's the present.  And the present is

17  that Dr. Ortiz has nothing to lose.  Granted, he may not be

18  able to step into a medical facility and practice medicine in

19  the U.S., but he could very easily cross the southern border

20  and go into a hospital in Mexico and probably pick up life as

21  normal, albeit in a foreign country.

22       In terms of the tax argument, I don't agree.  I don't

23  think taxes are things you should be putting off.  You can't

24  just put those off.  He's -- $300,000 a year is what he's

25  making, and he has a multimillion-dollar tax debt that's

1    lingered for seven years.  His house that he owns here in the

2    community, it's liened up.  He effectively does not own that

3    house because that tax lien is on the house through the

4    filing of those tax liens.  There's nothing to lose there.

5        Your Honor, things are very different and have become

6    very different for Dr. Ortiz, accelerating in 2022 with the

7    Medical Board actions, with his own actions, and things have

8    accelerated.  And I think that acceleration also proves he's

9    accelerated his conduct, going back to 2015, with the

10   retaliation against the dog.  He's repeating the same conduct

11   here.  And that's why we urge that there are no conditions or

12   combination of conditions that can assure the safety of the

13   community from him.  Additionally, that he will show up at

14   trial.

15       It's a different ball game, Your Honor, and you've heard

16   all the things that are -- that are lined up against him

17   right now.  And that's the reason he's been doing what he's

18   doing at the hospital, which is reprehensible.

19       That's all I have to say, Your Honor.

20           THE COURT:  All right.  Thank you.

21           MS. HARPER:  May I respond just briefly, Your Honor?

22           THE COURT:  You may.

23           MS. HARPER:  And just briefly.  I -- Mr. de la Garza

24   is engaging in supposition.  Because somebody could do

25   something is not the same thing as somebody will do

1    something.

2         We don't have to guarantee with one hundred percent

3    certainty.  The fact that Dr. Ortiz might be able to go get

4    another job, or he could cross the border at a nonspecified

5    border crossing, or this could happen:  That's not the

6    standard.  There has been absolutely zero showing that

7    there's been any planning done towards that or any steps

8    taken towards that.  And for that reason, I do believe that

9    we have rebutted that argument.

10         Thank you, Your Honor.

11             THE COURT:  All right.  Thank you.

12         (Off the record, 12:27 p.m. to 12:52 p.m.)

13             THE COURT:  All right.  We're back here today for a

14   detention and preliminary hearing as to Defendant Raynaldo

15   Rivera Ortiz, Jr., who's charged with four violations under

16   -- in a criminal complaint filed here in this Court.

17         As to probable cause, based on the evidence today,

18   particularly the evidence -- Government's Exhibits 1 through

19   8 and the evidence -- and the testimony of the case agent, I

20   do find probable cause to believe that Dr. Ortiz committed

21   each of the four violations as alleged in the complaint so

22   that there is a probable cause for this case to go forward

23   against him.

24         On the matter of detention, Dr. Ortiz is eligible for

25   pretrial detention under 18 United States Code, Section

1    3142(f)(1)(B) because he is charged by a complaint with and

2    the Court has now found probable cause to believe that he

3    committed an offense for which the maximum sentence of

4    imprisonment is life imprisonment -- specifically, the

5    alleged violation of 18 United States Code, Section 1365(a).

6        Being eligible for pretrial detention, then, which is

7    governed by the provisions of the Bail Reform Act, as

8    provided in 18 United States Code, Sections 3142 and 3144,

9    the law provides that the Court should order detention if it

10   finds that there is no combination of conditions that will

11   reasonably assure the Defendant's appearance as required or

12   the safety of any other person or the community.

13       The Government has the burden to show the appropriateness

14   of detention, but doesn't have to show both of those things.

15   The Government can even show either by a preponderance of the

16   evidence that there are no combination of conditions that

17   could reasonably assure the Defendant's appearance or by

18   clear and convincing evidence that there is no combination of

19   conditions that would reasonably assure the safety of others

20   or the community.

21       In making a determination here, I have considered the

22   testimony of the case agent, the agent of the Department of

23   State, Dr. Ortiz's friend and former attorney, the proffer of

24   testimony from both counsel for Dr. Ortiz and the Government,

25   Government's Exhibits 1 through 8, as admitted, as well as

1  the criminal complaint and affidavit in support, and the

2  report of Pretrial Services, all in light of the factors that

3  Congress directed the Court to consider in making release or

4  detention decisions under the Bail Reform Act.

5       Those include the nature and circumstances of the offense

6  charged; the apparent weight of the evidence against Dr.

7  Ortiz; his history and characteristics; whether he was at the

8  time of the current offense or arrest on probation, parole,

9  or other release pending trial, sentencing, appeal, or

10 completion of a sentence under federal, state, or local law;

11 and the nature and seriousness of the danger to any other

12 person or the community that would be posed by his release.

13      Here, the evidence shows that the Defendant is an

14 anesthesiologist who has been practicing for many years but

15 whose license has been suspended within the last few weeks

16 after it was determined his practice of medicine poses a

17 threat to public welfare and after last month the Texas

18 Medical Board had sanctioned him for failing to meet the

19 standard of care for a patient.

20      The Defendant has longstanding ties to the community.

21      He also has a conviction for cruelty to non-livestock

22 animals -- specifically, shooting his neighbor's dog -- in

23 2015, for -- in 2016, the actual sentencing, for which he was

24 sentenced to 29 days' imprisonment that he served on

25 weekends.

1          In affirming that conviction, the Dallas Court of Appeals

2     held that the evidence at trial supported a finding that Dr.

3     Ortiz had a motive to shoot his neighbor's dog because he was

4     angry with his neighbor for her role in breaking -- in his

5     breakup with his ex-girlfriend, including testifying at a

6     protective order proceeding.

7          The Court also heard evidence that sometime in the last

8     several years, during the current COVID-19 pandemic, Dr.

9     Ortiz became angry at colleagues at another medical center,

10    not the one involved here today in the charges here today,

11    when he was asked to wear a face mask.

12         The evidence also shows that Dr. Ortiz's daughter, who is

13    employed as his personal assistant, is willing to serve as

14    his third-party custodian and move with her husband into his

15    house if necessary to serve in that role.  And Defendant's

16    counsel explained that Dr. Ortiz is employable if he were to

17    be released, although he won't be working in health care.

18         The evidence also shows that two staff members at the

19    center involved in the current charges refused to speak to

20    investigators after expressing fear of what Dr. Ortiz would

21    do if they did so, and one referenced the face mask incident

22    at the other center that he or she had heard about.

23         As to the nature of the offenses charged, the evidence

24    suggests that Dr. Ortiz, apparently angry at recent

25    professional disciplinary actions against him, tampered with

1    IV bags at the surgical center at which he worked, and that

2    those tampered bags resulted in several emergency incidents

3    during patient surgeries and possibly the death of one of Dr.

4    Ortiz's anesthesiologist colleagues.

5         As to the risk of danger to an individual or the

6    community, the Government must show clear and convincing

7    proof that the Defendant presents a demonstrable danger to

8    the community or to an individual which no combination of

9    conditions can dispel or mitigate.  Here, I find the

10   Government has presented specific facts to support finding,

11   based on clear and convincing evidence, that Dr. Ortiz poses

12   a specific threat and danger to continue to engage in or in

13   the future engage in violent, retaliatory behavior against

14   those who are involved in this investigation, even if he is

15   released on conditions.

16        As the Government has persuasively argued, the evidence

17   today convinces the Court against that standard.  Dr. Ortiz's

18   conduct tracks but is escalating from what he was convicted

19   of in 2015 and 2016.

20        And I find, on all the evidence here today, based on the

21   appropriate factors that I listed earlier that Congress

22   directed the Court to consider under the Bail Reform Act,

23   that there is no combination of conditions, including

24   restrictive conditions or conditions including Dr. Ortiz's

25   daughter serving as his proposed third-party custodian or any

1    location monitoring, I find that there is no combination of

2    conditions that will reasonably assure the safety of the

3    community or another individual if Dr. Ortiz is released

4    while this case is pending.

5         So, for that reason, I will grant the Government's motion

6    for detention, order that Dr. Ortiz be remanded into the

7    custody of the United States Marshal and detained while this

8    case is pending.  And a written order will follow.

9         Ms. Harper, anything further for today?

10              MS. HARPER:  No, Your Honor.  Thank you.

11              MR. DE LA GARZA:  No, Your Honor, thank you.

12              THE COURT:  Mr. de la Garza?

13        Good luck to you, Dr. Ortiz.  The Defendant is remanded

14   into the custody of the United States Marshal.  Counsel are

15   excused.  And we will adjourn.

16              THE CLERK:  All rise.

17        (Proceedings concluded at 12:59 p.m.)

18                         --oOo--

19                        CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        **09/23/2022**

23   _____     _____
     Kathy Rehling, CETD-444                        Date
24   Certified Electronic Court Transcriber

25

INDEX

PROCEEDINGS                                                    2

WITNESSES

Government's Witnesses

Daniel J. Allgeyer
- Direct Examination by Mr. de la Garza                        4
- Cross-Examination by Ms. Harper                             37
- Redirect Examination by Mr. de la Garza                     61

Tom Huszcza
- Direct Examination by Mr. de la Garza                       62
- Cross-Examination by Ms. Harper                             65

Defendant's Witnesses

Kristi Motley
- Direct Examination by Ms. Harper                            67
- Cross-Examination by Ms. Martin                             74

EXHIBITS

Government's Exhibit 1                            Received 32
Government's Exhibit 2                            Received 30
Government's Exhibit 3                            Received 32
Government's Exhibit 4                            Received 34
Government's Exhibit 5                            Received 15
Government's Exhibit 6                            Received 24
Government's Exhibit 7                            Received 26
Government's Exhibit 8                            Received 90

RULINGS                                                      101

END OF PROCEEDINGS                                           106

INDEX                                                        107